[No. S051451. Apr. 14, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFREDO VALENCIA, Defendant and Appellant.

COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Donald J. Ayoob, Chief Assistant State Public Defender, and Jamilla Moore, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Bradley A. Weinreb and Ivy B. Fitzpatrick, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHIN, J.—A jury convicted defendant Alfredo Valencia of the first degree murder of Roberto Cruz under the special circumstance of robbery murder and with personal use of a knife. (Pen. Code, §§ 187, 190.2, subd. (a)(17), 12022, subd. (b).)[1] After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict (§ 190.4) and imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. *Guilt Phase*

During the evening of December 15, 1993, defendant stabbed Roberto Cruz to death in Cruz's red Camaro. This is undisputed. The prosecution theory at trial was that defendant murdered Cruz while robbing him of money Cruz had obtained earlier that day when he cashed a paycheck. The defense theory at trial was that defendant did not rob Cruz and that, due to the ingestion of methamphetamine, he acted in "imperfect self-defense"; he killed Cruz in the actual but unreasonable belief he had to do so in self-defense. (See *In re Christian S.* (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

### 1. *Prosecution Evidence*

Ana Mendoza testified that she worked at 825 North Cypress, an industrial complex in Orange, California. On December 15, 1993, around 9:30 to 9:40 p.m., while she was arriving at work, a man wearing black shorts, a cap, and a black jacket approached her car and said something in English. The man

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

appeared normal, and Mendoza could not see him carrying anything. He pointed to a nearby red car. Mendoza, who does not speak English, could not understand what he said. The man then left. Although Mendoza could not identify anyone as the man she encountered, other evidence showed that he was defendant, and he had just stabbed Cruz in the red car.

In the early morning hours of December 16, 1993, the police were called to the same industrial complex. They arrived around 1:45 a.m. and observed Cruz's body in the driver's seat of a red Camaro. The back of the driver's seat was broken and swiveled to the right. The seatbelt was wrapped around Cruz's neck and then went down between his feet. Cruz's head and left shoulder were on the rear seat, with his legs and knees on the floorboard. Cruz had bled to death from multiple knife wounds to his chest, left leg, and neck. One of the wounds entered his heart. He also had defensive wounds on his hands and arms.

The Camaro's keys were in the ignition, and a "for sale" sign was displayed on the front passenger's side window. The interior of the car was in disarray. Blood was found throughout the interior, including on the victim's clothes. A knife with a three-inch blade was found on the floor. It had belonged to one of defendant's neighbors, whose house defendant frequently visited. The knife could have inflicted the wounds. A wallet, containing the victim's identification and $52, was found under the body. The bulb from the car's dome light was on the rear right floorboard. Defendant's left thumbprint was on the bulb. It had been left after the thumb had come into contact with blood. On the rear floor was a pair of bloodstained blue jeans containing a watch with "Fred" and "Big C" scratched on it and a set of keys that opened the garage door of defendant's home.

Cruz had worked at McKibbon Screenprinting. December 15, 1993, was a payday. Company records showed that Cruz worked until 3:34 p.m. that day and received a payroll check for $686.46. Bank records showed that Cruz cashed the check at 4:10 the same afternoon. Cruz received cash and did not deposit the money into his account. The balance in his account at that time was $38.

Guillermo Padilla, Cruz's neighbor, who lived on Oak Street in Orange, testified that Cruz owned a red Camaro. Between 8:15 and 8:45 the evening that Cruz was killed, Padilla observed Cruz working on the car. Defendant, known to Padilla as "Chino," was with Cruz. Padilla had seen defendant in the neighborhood several times previously.

Norma Pulido lived with Cruz and others in an apartment on North Oak Street in Orange. She testified that Cruz owned a red Camaro like the one in

which his body was found. He also always carried a blue backpack to and from work and routinely wore a pair of gloves. On December 15, 1993, she observed Cruz working on his car between 7:00 and 9:00 p.m. She saw him again in his bedroom writing around 9:30 p.m. That was the last time she saw him alive. She never saw Cruz's backpack or a large amount of money after that night.

On the seat of the red Camaro, the police found a pair of gloves matching the description Pulido gave of the gloves Cruz wore. They never found the backpack or a large sum of money despite searching the car, Cruz's home, and defendant's home. A search of Cruz's room uncovered no documents or anything else indicating that Cruz had spent the money from the payroll check.

Defendant and Cruz lived about two-tenths of a mile from each other and approximately a mile and a half from where Cruz's body was found. Cruz was 22 years old when he died, was five feet six inches tall, and weighed 144 pounds. After his death, his blood was examined and found to contain no alcohol, marijuana, or other drugs. A sample of defendant's blood was drawn at 10:40 p.m. on December 16, 1993. It contained 240 nanograms of methamphetamine per milliliter.

Defendant was arrested in this matter at 3:10 p.m. on December 16, 1993. Detective Jorge De Souza of the Orange Police Department and another detective spoke with him beginning at 5:27 p.m. A long and rambling tape-recorded interview ensued. During the interview, Detective De Souza observed no unusual or bizarre behavior on defendant's part. Defendant was uninjured.

After waiving his constitutional rights and agreeing to talk to the police, defendant said he knew the victim. He did not know his name but knew he lived on Oak Street. He called him "Paisan," which was like a "border brother" or someone who came from a ranch. Defendant was with Cruz the night Cruz died because he was interested in buying Cruz's car. Cruz was asking $700 for it. At one point, defendant said that he and Cruz had "smoked a joint." Later, he said he had smoked one or two joints but took nothing else. He specifically said he did not "do speed" that night. While being interviewed, defendant said he was missing his wallet, the key to his garage door, and his watch. Detective De Souza told him they had found the key and watch, although not the wallet, inside a pair of pants. Defendant said the pants found in the car were his and identified the watch and keys as his. He said that the "Big C" scratched on the watch stood for Chino. At first, he denied knowing anything about a backpack. Later, he said that "Octavio," an

acquaintance, might have had a backpack in his car, although he did not know where it was at the time of the interview. Still later, he again denied knowledge of a backpack.

Defendant admitted driving with Cruz in Cruz's car that evening but at first denied stabbing him. Later, after the police confronted him with some of the evidence, he admitted the stabbing, although even after that he would sometimes deny it. He agreed that he was uninjured and stated that no one had attacked him the night before, and he had had no need to defend himself. He said he stabbed Cruz while the two were alone in Cruz's car. When asked why he stabbed Cruz, defendant gave varying accounts. He said that Cruz was a "queer man" and a "faggot" and he, defendant, "got hypnotized." He said, "The queer is dead." Later he said that Cruz "tried to kill me . . . and I killed him." He also said that he used "the knife that he tried to kill me with." When asked how many times he stabbed Cruz, defendant responded that he did not know. "I just went off." He also said, "I killed him [because] we got to survive."

At first defendant said that Cruz had produced the knife, but then he said that he had brought it himself. He said he got the knife from a house near "Orangegrove and Handy" (presumably defendant's neighbor whose house defendant frequently visited). He said, "I've been hypnotized now . . . to kill and that was my first victim last night." He also said that "there was some . . . girl had the light the video light right there on the street." She was "shooting a video." He denied taking Cruz's wallet or any other property. He also said "we have to take our stand in America . . . [a]gainst the dope pushers against the fags against the diseases." That, he said, was what he had done the night before.

Defendant said he talked to a woman on Cypress (presumably Ana Mendoza). At that point, he was running from someone "who was attacking me." "I was running for my life." He knocked on the woman's car window and asked for a ride. She said no, so he "took off." He left in his shorts, leaving his pants behind. The pants were covered with Cruz's blood. Defendant reiterated that he had stabbed Cruz, but at this point said he did not know why. He said there had been no sex act between him and Cruz, and that one was not going to happen. When asked why he called Cruz a "queer," defendant replied it was because "he was gonna attack me." Defendant said he had brought the knife with him to stab Cruz, but he had no plan. He did it just "[b]y impulse." When asked how it could just be an impulse, he responded that he did not know because "it was telling me to do it." Voices were telling him to do it.

Towards the end of the interview, defendant summarized what had happened. He possessed the knife intending to stab or kill Cruz. He got into the

car with Cruz and they drove to Cypress Street, where he stabbed Cruz. He took off his pants because they were bloody, and left wearing his jogging shorts. At this point, defendant said that Cruz "didn't attack me." He agreed that Cruz did not do anything to him. He said he stabbed Cruz "to survive," and it was his "duty."

### 2. Defense Evidence

Defendant presented evidence suggesting that Cruz might have sent the money from his paycheck to his family in Mexico and suggesting other reasons the money might have disappeared. He also presented evidence that Cruz did not routinely carry the backpack.

Max Schneider, an expert on chemical dependency, testified regarding the effect methamphetamine use might have on a person. Among other things, it can cause paranoia. Defendant presented evidence that he had often used heroin and methamphetamine. Several witnesses testified regarding defendant's strange behavior during the time period leading up to Cruz's killing. Jerry Valencia, defendant's brother, testified that the night of the killing, defendant and he smoked a joint of marijuana and drank beer with Cruz. Jerry did not see Cruz smoke marijuana.[2]

### B. Penalty Phase

### 1. Prosecution Evidence

The prosecution presented evidence that defendant committed the following crimes, some of which resulted in felony convictions.

On December 20, 1978, defendant and others kicked in an apartment door in Orange, robbed three men of their wallets at gunpoint, and hit one of the victims in the head with a gun. Defendant confessed to his involvement. He said he took the wallets but did not personally hit anyone or kick in the door.

On March 9, 1979, defendant and three or four others assaulted two men in Orange who were sitting in one of the victim's 1965 Mustang. They stole a paycheck and the car. For this incident, defendant was convicted of aggravated assault.

On June 29, 1981, defendant, wielding a gun, robbed a man who was standing at a bar bathroom urinal in Santa Ana of money from his wallet.

---

[2] In rebuttal, the prosecution presented evidence that when defendant was arrested he had no drugs on his person, and a search of his home the same day uncovered no evidence of drug usage.

On September 3, 1982, defendant robbed a gas station attendant at gunpoint in Fullerton, taking over $1,000 from a safe. For this incident, defendant was convicted of robbery with use of a firearm.

On September 22, 1982, defendant robbed a man and a woman at gunpoint in a liquor store in Garden Grove. He took about $300 to $500 from a cash register. For this incident, defendant was convicted of robbery with use of a firearm.

On September 23, 1982, defendant robbed a gas station attendant in Garden Grove at gunpoint of more than $100.

On September 26, 1982, defendant robbed a grocery store clerk in Anaheim. As he was leaving the area, he threatened to kill or shoot a man who had witnessed the crime. For this incident, defendant was convicted of robbery.

On September 27, 1982, defendant robbed a gas station attendant in Anaheim at gunpoint of around $500. For this incident, defendant was convicted of robbery with use of a firearm.

On October 1, 1982, defendant robbed a gas station attendant in Anaheim at gunpoint of around $200. For this incident, defendant was convicted of robbery with use of a firearm.

On October 2, 1982, defendant robbed a liquor store manager in Orange at gunpoint of around $500. For this incident, defendant was convicted of robbery with use of a firearm.

On October 9, 1982, defendant robbed a gas station attendant in Anaheim at gunpoint of around $600. For this incident, defendant was convicted of robbery with use of a firearm.

On October 21, 1982, defendant robbed a clerk at a 7-Eleven store in Orange at gunpoint of money from a cash register.

Defendant was convicted of robbing Kenneth Eckman on October 29, 1982.

Defendant was convicted of grand theft from the person committed on August 7, 1988.

On August 13, 1988, defendant assaulted two men in a residential hotel with an aluminum baseball bat, injuring both men.

On August 25, 1988, defendant robbed a man in Santa Ana at knifepoint of money and stole his car.

On October 9, 1991, defendant, holding a baseball bat, and another person, holding a gun, approached a man in a truck in Santa Ana and forced him to drive to a nearby house, where they robbed him of his wallet, which contained $252.

Roberto Cruz's parents, Juana and Martin Cruz, testified about their son and his background, and the impact his death had on them.

### 2. Defense Evidence

Defendant presented evidence in mitigation from many lay witnesses and one expert. As defendant summarizes in his appellate brief, "the layperson testimony ranged from generalized testimony from [defendant's] Little League coach, neighbors, young niece and nephew and brother-in-law regarding his good natured demeanor, team spirit, generosity and love for others to testimony from his family and former girlfriend regarding his descent into drug addiction. [Defendant's] mother, sister and brother provided additional details to supplement their guilt phase testimony regarding [defendant's] mental deterioration after he became addicted to methamphetamine. The Valencia family members also described their painful recollections of physical abuse inflicted upon them, and [defendant], by [defendant's] father."

Dr. George Woods, a psychiatrist specializing in chemical dependency treatment and forensic psychiatry, testified generally regarding defendant's drug addiction. In Dr. Woods's professional opinion, defendant "was suffering from an amphetamine psychosis at the time of the crime."

## II. DISCUSSION

### A. Guilt Issues

#### 1. Alleged Prosecutorial Misconduct

Defendant contends the prosecutor engaged in prejudicial misconduct "from the starting gate to the finish line" of the trial.[3]

---

[3] With respect to this and most other claims on appeal, defendant argues that the asserted error or misconduct infringed various of his constitutional rights. He generally failed to assert some or all of the constitutional arguments he now advances. "In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke

He first contends that the prosecutor improperly "cast[] aspersions upon defense counsel and witnesses." The first act allegedly doing so occurred during jury voir dire. In questioning the prospective jurors about the death penalty, defense counsel stated, "The law says you do not have to return a verdict for the death penalty unless you feel that that's necessary and appropriate." The prosecutor objected that the statement misstated the law. The court overruled the objection even though it noted that the statement "wasn't exactly precise." Later, when it was the prosecutor's turn to question the jurors, he said, "I'm not saying Mr. Chaparro [defense counsel] would intentionally misstate anything, but obviously his view of the facts and his view of the law differs from mine or we wouldn't be here. . . . Mr. Chaparro, and maybe mistakenly, said it's up to you to determine whether or not the death penalty is necessary and appropriate. That's not what the law says. The law says in weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate. Which penalty is justified. Not necessary. It's never necessary to execute anyone. We would never be able to prove it's necessary to impose the death penalty. The question is whether that penalty is justified under the evidence, whether the aggravating factors substantially outweigh the mitigating factors so that the appropriate penalty is the death penalty." Defense counsel objected that the statement "does misstate—it's incomplete." The court overruled the objection.

Defendant contends that the prosecutor "cleverly engaged in the 'rhetorical device' of 'paraleipsis'—stating one thing but 'suggesting exactly the opposite' . . . to plant the first suggestion that defense counsel would be deceptive." (See *People v. Wrest* (1992) 3 Cal.4th 1088, 1107 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) However, he did not object on that basis at trial. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Defendant's only objection to these comments was that the prosecutor misstated the law. Accordingly, only that objection is cognizable on appeal. Defendant does not now argue that the prosecutor misstated the applicable law. In fact, the

facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.]

"In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

prosecutor's statement of the law was more accurate than defense counsel's. (See *People v. Brown* (1985) 40 Cal.3d 512, 541–544 [230 Cal.Rptr. 834, 726 P.2d 516].) As the prosecutor properly noted, no requirement exists that the death penalty be "necessary." Even if the issue regarding paraleipsis were cognizable, in the context in which the prosecutor's comments arose, we see no impropriety. It was appropriate for the prosecutor to correct defense counsel's inaccurate description of the law while emphasizing he was not accusing counsel of being deliberately deceptive.

Next, defendant complains that, during the direct examination of a prosecution witness, the prosecutor stated in front of the jury, "Your honor, I had one other area I wanted to go in, but I think the defense wants a 402 hearing before I ask the questions." Defense counsel asked to approach the bench, and a conference outside the jury's presence ensued. Defense counsel objected that the prosecutor's reference to a "402 hearing" was "basically telling the jurors that he wants to put in some evidence but the defense is trying to keep it out. That's improper, that's unethical." He moved for a mistrial. The court denied a mistrial but instructed the attorneys "not to indicate that one party or the other is objecting to the next line of questioning." The prosecutor agreed not to do so in future. He also explained that he made the comment because defense counsel had told him he would object to certain evidence and would want the hearing. He had decided not to ask questions and elicit an objection but instead to explain to the court that a hearing would be needed before he could continue. The court and parties then held the hearing that defense counsel had wanted.

Defendant argues that using the term "402 hearing"—obviously a reference to Evidence Code section 402, which provides for a hearing outside the jury's presence on the admissibility of evidence—was another example of the prosecutor's denigrating defense counsel. We disagree. As the prosecutor noted, it is unlikely the jurors knew what a "402 hearing" was. Additionally, what the prosecutor said was accurate, for defense counsel *did* want a hearing, and the comment cast no aspersions on defense counsel. It is not, and should not be, a secret to juries that rules exist for the presentation of evidence, and that parties sometimes object to the admission of evidence. If the prosecutor had simply asked the questions and defense counsel had objected, the jury would have known defendant was trying to exclude evidence. The reverse occurs when the defense asks questions and the prosecutor objects. This process is not inherently prejudicial. The prosecutor did not again suggest that the defense would be objecting to evidence after the court instructed him not to do so. We see no misconduct.

Defendant next complains of some of the prosecutor's cross-examination of defense witnesses, especially of defendant's siblings. The prosecutor

questioned some of these witnesses in detail regarding how many times they had spoken with members of the defense team. Defendant complains that this cross-examination "improperly created the illusion that the defense had scripted and rehearsed their witnesses and that the witnesses had as a result fabricated new information for their testimony." The Attorney General argues that some of the current complaints are not cognizable on appeal because defendant did not object at trial. We disagree. After reading the entire record, we believe defendant adequately objected to the comments on the ground asserted on appeal.

But we also see no misconduct. The prosecutor asked legitimate questions going to the witnesses' credibility. As he did at trial, defendant complains that asking about *conversations* is different from asking about *substantive interviews* regarding the case. He claims that the prosecutor's "strategy intentionally blurred the distinctions between contacts during which the witness's personal testimony was discussed, and contacts that were nothing more than a reminder call about an appointment or court appearance." However, as the trial court repeatedly noted in response to the argument at trial, this is what redirect examination is for. If one party believes that questions on cross-examination leave the jury with an incorrect impression, it can ask clarifying questions on redirect examination. In the same way, if an attorney believes questions on direct examination may have been incomplete or misleading, the attorney can explore the topic on cross-examination. That process occurred here. On redirect examination, defense counsel questioned the witnesses further about the nature of their conversations with the defense team. Defendant asserts that the trial court "barred defense counsel from using redirect examination to clarify the nature of each contact with the challenged witnesses," but the record does not support the assertion. We have examined all of defendant's specific complaints regarding the prosecutor's cross-examination of the witnesses and find no impropriety.[4] Sometimes the prosecutor cross-examined witnesses vigorously, but the trial court maintained control and permitted defendant to ask clarifying questions on redirect examination.

█ Defendant contends the prosecutor committed misconduct during his guilt phase argument to the jury. First, he complains that the prosecutor continued to cast aspersions on defense counsel and witnesses. Essentially, he complains that the prosecutor argued, over objection, that the number of times the witnesses spoke with members of the defense team meant that the

---

[4] For example, the prosecutor began his cross-examination of one of defendant's brothers by asking, "Mr. Valencia, sir, isn't it true that you're lying here today in order to assist your brother in the defense of his case?" The witness responded that it was not true. Although the question was vigorous, it was directed to explore possible bias in the witness, a proper topic of cross-examination.

witnesses must have been coached. We have reviewed the comments complained of and see no impropriety. The prosecutor was entitled to argue his interpretation of the evidence, just as defendant was entitled to argue his interpretation of that same evidence. "[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the deductions are illogical because these are matters for the jury to determine. [Citation.] The prosecutor may not, however, argue facts or inferences not based on the evidence presented." (*People v. Lewis* (1990) 50 Cal.3d 262, 283 [266 Cal.Rptr. 834, 786 P.2d 892]; see also *People v. Cash* (2002) 28 Cal.4th 703, 732 [122 Cal.Rptr.2d 545, 50 P.3d 332].) The comments complained of come within this wide range of permissible argument.

Defendant also complains that the prosecutor stated at one point that the defendant "has had a fair trial. He has had two competent attorneys who were representing him. They were entitled to present any witnesses they wanted over the course of the last month." Defendant objected and later moved for a mistrial due to these comments. The court overruled the objection and denied the mistrial motion. As he did at trial, defendant argues the argument was incorrect because the defense was not allowed to present *any* witnesses they wanted due to certain evidentiary rulings. Although the prosecutor's statement was not literally correct, its significant gist—that defendant had received a fair trial represented by competent counsel who were allowed to present their case—was correct. Reasonably implicit in the statement was that the defense was entitled to present any witnesses it wanted *consistent with the rules of evidence*. The jury was not misled in any significant way that prejudiced defendant.

On another occasion, over objection, the prosecutor argued that "it seems like the mental defense that they're using is either intoxication, that he was under the influence of methamphetamine, which they haven't really shown us, or, number two, that he was paranoid, that he had some type of mental disease, mental defect, or mental disorder, which, again, they haven't shown us." Defendant claims that this argument misstated the evidence. He notes that the evidence showed that blood drawn from him after his arrest tested positive for methamphetamine and thus claims there *was* evidence he was under the influence of methamphetamine. He also argues that other evidence supported the defense case. However, defendant was arrested some 17 hours or so after the killing. The evidence showed that he took methamphetamine sometime before he was arrested. But the prosecutor could at least argue that there was no evidence he was under the influence of methamphetamine *at the time of the killing*, which is what matters. Indeed, although defendant told the police that he smoked marijuana the night of the killing, he specifically

denied using methamphetamine. The overall evidence was fully consistent with the prosecutor's theory of the case, which was that defendant murdered Cruz to obtain money to support his drug habit, then used the money to buy and consume the methamphetamine that was in his system when arrested. Whether or not defendant had shown that he was under the influence of methamphetamine or was paranoid when he killed Cruz was certainly open to debate. The prosecutor was entitled to argue defendant had not shown these facts; defense counsel was entitled to argue the opposite. The comments came within the wide range of permissible discussion of the evidence.

Defendant also contends the court erred in denying his new trial motion due to the alleged misconduct. We disagree. Because the prosecutor engaged in no misconduct, the court acted within its discretion in denying the new trial motion. (*People v. Seaton* (2001) 26 Cal.4th 598, 693 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

### 2. *Exclusion of Defense Evidence*

Defendant sought to elicit testimony from three witnesses that on the day he died, Cruz said that he wanted to have sex that night. Specifically, defense counsel offered testimony from defendant's brother, Jerry Valencia, that Cruz used the Spanish word "cojer," meaning "getting some," i.e., sex; and from two of Cruz's coworkers who would testify that at work that day Cruz said to them something like "esta noche come pancho," which, defense counsel stated, meant "in the vernacular that this night he was going to score with a woman."

Defendant argued that the evidence was relevant to show that Cruz might have made similar comments to defendant before defendant stabbed him and that "if [defendant] was on methamphetamine or was on a methamphetamine psychosis, he could easily misinterpret the information given to him and react accordingly." The evidence, defendant argued, "would tend to prove circumstantially that [defendant] possibly misunderstood Roberto Cruz's statement and that's why he panicked and that's why the killing occurred." He also argued the testimony from Jerry Valencia was relevant to rebut suggestions the prosecutor made in cross-examination that the witness had not spoken with Cruz. The prosecutor objected on hearsay grounds and on the ground that the evidence was more prejudicial than probative under Evidence Code section 352. After hearing arguments from both sides and reviewing a trial brief defendant submitted on the question, the court sustained the objection.

Defendant contends the court erred in excluding the evidence. He argues it was admissible for a nonhearsay purpose—as circumstantial evidence that Cruz made similar comments to him later that same day—or under

the state-of-mind exception to the hearsay rule. (Evid. Code, § 1250.) We may assume for present purposes that the hearsay rule did not preclude admission of this evidence, for the court had discretion to exclude the evidence for another reason. Its prejudicial effect substantially outweighed its probative value. "In general, the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal in the absence of an abuse of that discretion. [Citations.] This discretion is not, however, unlimited, especially when its exercise hampers the ability of the defense to present evidence." (*People v. Cooper* (1991) 53 Cal.3d 771, 816 [281 Cal.Rptr. 90, 809 P.2d 865].) We see no abuse of discretion in this case.

■ In light of the rest of the evidence, admitting this evidence could have confused the jury regarding how to consider it. Neither defendant's statement to the police nor other evidence supported the inference defendant urged at trial. Defense counsel's offer of proof said that Cruz was interested in sex with a woman, not with a man. Although defendant occasionally said to the police that Cruz was a "queer" or a "fag," he never said that Cruz had made any sexual overtures towards him or that he stabbed Cruz in response to any such overtures. Indeed, he specifically denied that any sex act had occurred between himself and Cruz and said one was not going to happen. Defense counsel argued that the evidence would circumstantially prove that defendant may have "misunderstood Roberto Cruz's statement," but defendant never claimed to the police that Cruz had made any statement regarding sex that he could have misunderstood. Additionally, although one who kills in the unreasonable but actual belief in the need for self-defense is guilty of manslaughter rather than murder (*People v. Blakeley* (2000) 23 Cal.4th 82, 92 [96 Cal.Rptr.2d 451, 999 P.2d 675]),[5] the belief must be in the need to defend against imminent danger "to life or great bodily injury." (*In re Christian S., supra*, 7 Cal.4th at p. 783; see *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [56 Cal.Rptr.2d 142, 921 P.2d 1].) Defendant did not testify at trial, choosing instead to rely on his statement to the police and other evidence. But his statement said little suggesting he believed he had to stab Cruz to death to defend against imminent death or great bodily injury. More importantly regarding the issue here, mere sexual overtures would not alone suffice to support a perfect or imperfect self-defense claim.

---

[5] In *Blakeley*, we held that in future cases, the crime would be voluntary manslaughter, but for killings like this one that predated the decision, the crime would be involuntary manslaughter. (*People v. Blakeley, supra*, 23 Cal.4th at p. 92.)

Under the circumstances, the trial court had discretion to conclude that the prejudicial effect of the proffered evidence—primarily by confusing the issues—substantially outweighed any probative value it may have had. We see no error.

### 3. *Jury Instructions*

Defendant contends the court made several instructional errors.

First, defendant contends the court erred in instructing the jury on perfect as well as imperfect self-defense. His theory at trial was that he killed Cruz in the unreasonable belief he had to do so in self-defense. This theory is called "imperfect self-defense," which makes the crime manslaughter because in that situation the defendant is deemed to have acted without malice. (*In re Christian S., supra*, 7 Cal.4th at p. 771.) Because defendant did not claim his belief was *reasonable*, he did not assert perfect self-defense, which would have been completely exonerating. For this reason, he asked the trial court to instruct the jury on imperfect but not perfect self-defense. After considerable discussion among the court and parties as to how the court should do this, the court ultimately instructed the jury on the elements of both perfect and imperfect self-defense. It also explained the difference between the two theories.

The instructions included that a "person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury kills unlawfully but does not harbor malice aforethought and is not guilty of murder. *This would be so even though a reasonable person in the same situation, seeing and knowing the same facts, would not have had the same belief.* Such an actual but unreasonable belief is not a defense to the crime of voluntary or involuntary manslaughter." (Italics added.) Later, the court explained, "It is lawful for a person who is being assaulted to defend himself from attack if, as a reasonable person, he has grounds for believing and does believe that bodily injury is about to be inflicted upon him." It went on to explain when and how much force a person may use in such circumstances.

After reading all of the instructions, the court reiterated the difference between perfect and imperfect self-defense. It explained that "[i]t is lawful for a person who is assaulted by deadly force or by force likely to inflict great bodily injury to defend himself by the use of deadly force. If a jury finds that this instruction applies, then the taking of life is lawful or justifiable." It explained which of the written instructions the jury would receive governed "this type of self-defense." It then said, "there is a second type of self-defense. Actual but unreasonable belief self-defense." It explained which of

the written instructions governed this second type of self-defense. It went on to state, "If a jury finds that this instruction applies, the taking of life is deemed unlawful; however, since malice aforethought is negated, the unlawful killing cannot be murder. That's the distinction between those two types of self-defense." It pointed to differences in the written instructions between the two types of self-defense, and specifically noted that perfect self-defense used a reasonable person standard and imperfect self-defense involved an "unreasonable belief." It also explained, "By making this effort to clarify this area, I am not trying to highlight the instructions or to tell you that these instructions are applicable or not applicable. It is for you, the jury, to determine the facts and apply the appropriate laws."

Defendant claims the court should not have said anything to the jury regarding perfect self-defense because he was not relying on this theory and no evidence supported it. He notes that " '[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case' " (quoting *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [17 Cal.Rptr.2d 365, 847 P.2d 45]), and asserts the jury might have "misunders[tood] the combined instructions as requiring a finding that [his] actions would have been lawful under standards of objective reasonableness *before* they could accept his theory of defense against first degree malice murder—i.e., his honest but unreasonable belief in his need to exercise self-defense." We disagree.

■ The concepts of perfect and imperfect self-defense are not entirely separate, but are intertwined. We have explained that "the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." (*In re Christian S., supra,* 7 Cal.4th at p. 773, fn. 1.) As applied to this case, this means that if defendant had first assaulted Cruz, then unreasonably believed Cruz was assaulting him, a claim of imperfect self-defense would be unavailable because a claim of perfect self-defense would have been unavailable had the belief been reasonable. To make the observation in *In re Christian S.* more general, not every unreasonable belief will support a claim of imperfect self-defense but only one that, if reasonable, would support a claim of perfect self-defense.[6] The trial court reasonably concluded

---

[6] As another example, if defendant had unreasonably believed Cruz was going to punch him in the arm and stabbed him to death in response, this belief would not support a claim of imperfect self-defense for the reason that the belief, even if reasonable, would not permit the use of deadly force.

that instructing the jury on perfect self-defense would help it to understand fully the law of imperfect self-defense. Thus, even if the evidence did not support a finding of perfect self-defense, instructing the jury on both theories was appropriate as long as the court made sure the jury was aware of the differences between the two theories, as it did. We see no error.

The trial court instructed the jury on both premeditated first degree murder and first degree felony murder. Defendant contends the court erred in not requiring the jury to agree unanimously which of these theories applies. We disagree. (See *People v. Morgan* (2007) 42 Cal.4th 593, 617 [67 Cal.Rptr.3d 753, 170 P.3d 129]; *People v. Nakahara* (2003) 30 Cal.4th 705, 712–713 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) Moreover, the jury found true the robbery-murder special circumstance, showing that it unanimously agreed he was guilty of first degree murder on at least a felony-murder theory. (*People v. Seaton, supra*, 26 Cal.4th at p. 671.)

Defendant contends the court erred in instructing the jury on first degree murder because the information charged him only with malice murder under section 187. We disagree. (*People v. Morgan, supra*, 42 Cal.4th at p. 616.) The information in this case alleged that the murder was committed under the special circumstance of murder in the course of a robbery, thus providing notice that the prosecutor would proceed under a felony-murder theory. (*Id.* at pp. 616–617.)

### 4. *Sufficiency of the Evidence*

Defendant contends the evidence was insufficient to support a first degree murder verdict on either a felony-murder or a premeditation theory and the robbery-murder special circumstance. As we explain, the evidence supports the felony-murder theory and the robbery special circumstance. The special circumstance finding shows the jury relied at least on a felony-murder theory in finding defendant guilty of first degree murder. Accordingly, we need not consider whether the evidence would also support a finding of premeditation. (See *People v. Kelly* (2007) 42 Cal.4th 763, 789 [68 Cal.Rptr.3d 531, 171 P.3d 548]; *People v. Guiton, supra*, 4 Cal.4th at p. 1130.)

The applicable law is settled. As we explained in a recent case also involving a challenge to the sufficiency of the evidence to support a robbery-felony-murder conviction and related special circumstance finding, " ' "To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rationale trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citations.] ' " 'If the circumstances

reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' [Citations.] The standard of review is the same when the prosecution relies mainly on circumstantial evidence. [Citation.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 104 [8 Cal.Rptr.3d 271, 82 P.3d 296].) The same standard of review applies to the special circumstance finding. (*Id.* at p. 105.)

Whether defendant killed Cruz with the intent to rob him or due to a drug-induced paranoia was a hotly contested issue at trial, indeed, essentially the only contested guilt issue. But the evidence supports the jury's resolution of this issue. A mere few hours before defendant stabbed him to death, Cruz cashed a payroll check for almost $700, receiving cash that he did not deposit into his account. The money was never found. Norma Pulido, a woman who lived with Cruz, testified that he always carried a backpack to and from work and routinely wore a pair of gloves. The gloves were found in the car after the stabbing, but the backpack was never located. A backpack would not normally simply disappear. Defendant took with him into Cruz's car a knife he had taken from a neighbor, suggesting his actions were planned and not, as he claimed at trial, caused by a sudden belief he had to kill. If, as the evidence suggests, his actions were planned, robbery was the most likely purpose. "Murders are commonly committed to obtain money or other property." (*People v. Horning* (2004) 34 Cal.4th 871, 903 [22 Cal.Rptr.3d 305, 102 P.3d 228].)

In his rambling statement to the police, defendant clearly was trying to minimize his culpability as much as possible consistent with the evidence. At first he denied stabbing Cruz, then he admitted it. At first he claimed Cruz produced the knife, then he admitted he brought it from a neighbor's house (as other evidence showed). At times he claimed Cruz had attacked him, at other times he admitted Cruz had not done so. Ultimately, he admitted he possessed the knife intending to stab or kill Cruz, although he also said he had no plan and stabbed Cruz "[b]y impulse." He consistently denied taking any of Cruz's property, but eventually he said that an acquaintance, "Octavio," might have had a backpack in his car. He also specifically denied using methamphetamine before the killing, although he said he smoked some marijuana. Defendant was uninjured at the time of the interview and, as far as the police could tell, acting normally.

This evidence supports the prosecution's theory that defendant robbed and killed Cruz to support his drug habit, then used the money to buy and consume the methamphetamine that was found in his system after his arrest. A reasonable jury, considering this same evidence, could reject defendant's explanation at trial as unreasonable. It was not required to believe defendant's claim to the police that he had not taken any of Cruz's property.

Defendant argues the habit evidence alone—here, the evidence that Cruz habitually carried the backpack—would not support a robbery finding. But it was not the sole evidence. For example, the evidence that Cruz received several hundred dollars in cash a few hours before defendant killed him, money that was never found, was not habit evidence. The evidence that Cruz habitually carried a backpack was probative (see *People v. Webb* (1993) 6 Cal.4th 494, 529 [24 Cal.Rptr.2d 779, 862 P.2d 779]) in light of the additional evidence that the backpack was never seen again after the killing.

Defendant also argues the trial court erred in not granting his motion, pursuant to section 1118.1, to dismiss the special circumstance allegation at the end of the prosecution case. The argument fails for the same reason his primary sufficiency-of-the-evidence argument fails. The evidence was sufficient to permit a reasonable jury to find that defendant stabbed Cruz to death in the course of robbing him.

B. *Penalty Issues*

1. *Admission of Preliminary Hearing Testimony*

The prosecution presented evidence showing that on October 9, 1991, defendant, holding a baseball bat, and Vincent Valdez, holding a gun, forced Hernan Sanchez to drive his truck to a nearby house, where they robbed him of his wallet. Over objection, the court ruled that Sanchez was unavailable to testify and admitted his testimony to this effect, given at the preliminary hearing on the felony charges arising from the 1991 incident. In addition to Sanchez's preliminary hearing testimony, the arresting officer for the 1991 incident testified in the instant trial that he had found defendant, appearing "shocked and . . . sweating," in one of the back rooms of the house, and found Valdez hiding in the bathroom. The officer also found a baseball bat in one of the bedrooms. The officer testified that Sanchez had identified defendant as one of his assailants.

■ Defendant contends that, for several reasons, the court erred in admitting Sanchez's preliminary hearing testimony. We disagree. "A defendant has a constitutional right to confront witnesses, but this right is not absolute. If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial. [Citations.] The constitutional right to confront witnesses mandates that, before a witness can be found unavailable, the prosecution must 'have made a good-faith effort to obtain his presence at trial.' " (*People v. Smith* (2003) 30 Cal.4th 581, 609 [134 Cal.Rptr.2d 1, 68 P.3d 302], quoting *Barber v. Page* (1968) 390 U.S. 719, 725 [20 L.Ed.2d 255, 88 S.Ct. 1318].) California law

and federal constitutional requirements are the same in this regard. (*People v. Smith, supra,* at p. 609.) Moreover, for the prior testimony to be admissible, the defendant must have had the opportunity to cross-examine the witness at that hearing with an interest and motive similar to that which defendant has at the hearing at which the testimony is admitted. (Evid. Code, § 1291, subd. (a)(2); *People v. Smith, supra,* at p. 611.) "The proponent of the evidence has the burden of showing by competent evidence that the witness is unavailable." (*People v. Smith, supra,* at p. 609.)

Defendant contends the court incorrectly found Sanchez was unavailable to testify. The court held a hearing outside the presence of the jury regarding the efforts the prosecution made to find Sanchez. John Santy, an investigator for the district attorney's office, testified that he began trying to locate Sanchez in August 1994. He called the telephone number that Sanchez had given in the police report regarding the incident, but the number had been reissued. He attempted to get a new telephone number for him through the telephone company but did not succeed. He also tried to get a new telephone number for Sanchez's address but did not succeed. He went to the home address Sanchez had given, but Sanchez no longer lived there. He checked with the Department of Motor Vehicles (DMV), using the driver's license number Sanchez had given. The driver's license number was correct, and he obtained an address for Sanchez at two different apartments at the same street address. He went to both apartments, but Sanchez no longer lived at either one. He spoke with five or six persons who lived in the apartments but received no leads. He received no information from the DMV regarding any vehicles Sanchez owned and no other relevant information. Using Sanchez's name and date of birth, he ran a "CII rap sheet" on him but found nothing. He also "ran a check through TRW," i.e., checked Sanchez's credit information, and checked various real estate holdings and information but found nothing. He also "ran through civil and public court proceedings" to see if Sanchez had any cases in court but found nothing. He rechecked these various sources of information the morning of his testimony in July 1995 but received no new information.

After the hearing, the court determined that the prosecution had used due diligence in trying to find Sanchez. When, as here, the relevant facts are undisputed, we review this determination independently. (*People v. Cromer* (2001) 24 Cal.4th 889, 901 [103 Cal.Rptr.2d 23, 15 P.3d 243].) After independent review, we agree with the trial court that the prosecution satisfied its burden of showing due diligence. The term "due diligence" " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " (*Id.* at p. 904.) "Relevant considerations include ' "whether the search was timely begun" ' [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation]." (*Ibid.*) The investigator began his efforts to locate Sanchez several months

before trial. Although Sanchez's testimony was critical to establish this prior crime, his testimony was not particularly important to the trial as a whole. Defendant's crime against Sanchez was only one of many prior crimes the prosecution presented at the penalty phase, many accompanied by felony convictions. Investigator Santy competently explored his leads. During cross-examination of the investigator, and in argument to the trial court and to this court, defendant has suggested other things the prosecution might have done. But these suggestions do "not change our conclusion that the prosecution exercised reasonable diligence. 'That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness.' (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298 [18 Cal.Rptr.2d 796, 850 P.2d 1].) Thus, the trial court did not err in determining that [Sanchez] was 'unavailable as a witness.' (Evid. Code, § 240.)" (*People v. Wilson* (2005) 36 Cal.4th 309, 342 [30 Cal.Rptr.3d 513, 114 P.3d 758].)

Defendant also argues that he did not have adequate opportunity to cross-examine Sanchez at the preliminary hearing. The record shows that after Sanchez testified, an investigator for Valdez (defendant's cohort, according to Sanchez) uncovered evidence impeaching that testimony. Essentially, some witnesses impeached some of Sanchez's testimony regarding his exact movements before defendant and Valdez confronted him and after the incident, and two persons, one a cousin of Valdez's, impeached other parts of Sanchez's testimony. This information suggested that Sanchez went to the house with a prostitute. After this information was uncovered, on the day trial for this crime was scheduled to commence, the charges were dismissed in the interest of justice on the district attorney's motion. Defendant infers that the charges were dismissed due to the discovery of this information, but the record does not reflect the reason the district attorney moved to dismiss the charges.

■ After hearing argument and reading Sanchez's preliminary hearing testimony, the trial court ruled that defendant had had adequate opportunity to confront Sanchez at the preliminary hearing, and admitted the prior testimony. It also invited defendant to present his impeaching evidence, and defendant did so. Defendant argues that his cross-examination of Sanchez would have been different had the impeaching information been known at the time he testified. This circumstance does not render the prior testimony inadmissible. Preliminary hearing testimony is generally admissible to show a prior crime at the penalty phase of a capital crime. (*People v. Smith, supra,* 30 Cal.4th at pp. 624–625.) ■ "Moreover, a defendant's interest and motive at a second proceeding is not dissimilar to his interest at a first proceeding within the meaning of Evidence Code section 1291, subdivision (a)(2), simply because events occurring after the first proceeding might have led counsel to alter the nature and scope of cross-examination of the witness in certain

particulars. (*People v. Alcala* (1992) 4 Cal.4th 742, 784 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) The ' "motives need not be identical, only 'similar.' " ' (*People v. Samayoa*[, *supra,*] 15 Cal.4th [at p.] 850.) 'Both the United States Supreme Court and this court have concluded that "when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement [citation], regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony." ' (*People v. Wilson*[, *supra,*] 36 Cal.4th [at p.] 343 . . . ; see *California v. Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930].)" (*People v. Harris* (2005) 37 Cal.4th 310, 333 [33 Cal.Rptr.3d 509, 118 P.3d 545].) ▮ Additionally, the fact the previous charges have been dismissed does not prevent their being proved at the penalty phase. (*People v. Stitely* (2005) 35 Cal.4th 514, 563 [26 Cal.Rptr.3d 1, 108 P.3d 182].)

At the preliminary hearing, the court sustained a few objections on relevance grounds to defendant's cross-examination of Sanchez concerning Sanchez's actions after he left the house where, he said, he had been robbed. Defense counsel had argued he wanted to ask Sanchez regarding when and under what circumstances he had reported the crime to the police. Defendant argues, as he did at trial, that these rulings denied him an adequate opportunity to confront Sanchez. After reviewing the transcript of Sanchez's testimony, the trial court found that defendant had received adequate opportunity to cross-examine Sanchez. We agree that these minor rulings at the preliminary hearing did not make the previous testimony inadmissible. We have recognized that in an extraordinary case, it might be " 'necessary to explore the character of the actual cross-examination to ensure that an adequate opportunity for full cross-examination had been afforded to the defendant.' " (*People v. Wilson, supra*, 36 Cal.4th at pp. 346–347, quoting *Ohio v. Roberts* (1980) 448 U.S. 56, 73, fn. 12 [65 L.Ed.2d 597, 100 S.Ct. 2531].)[7] This is no such extraordinary case. The few relevance objections the court sustained did not deprive defendant of a reasonably full opportunity to cross-examine. Indeed, as the district attorney pointed out at trial, the attorney for codefendant Valdez had been permitted to ask Sanchez how long it was after he left the house before he called the police.

Finally, defendant argues that all of these circumstances rendered the evidence of this incident too unreliable to be admissible. We disagree. As the district attorney noted in his argument to the jury, the subsequently discovered impeaching evidence that the defense presented at this trial may have shown that Sanchez went to the house to obtain the services of a prostitute,

---

[7] In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], the high court overruled *Ohio v. Roberts; supra*, 448 U.S. 56, on other grounds. (See *People v. Wilson, supra*, 36 Cal.4th at p. 343.)

and that he changed some of the details of the actual events to hide this fact, but none of the impeaching evidence directly challenged the basic core of Sanchez's testimony—that defendant and Valdez robbed him at that house. This was the testimony that mattered. The trial court properly admitted the preliminary hearing testimony and the rest of the prosecution's evidence, and permitted defendant to present his impeaching evidence, and then let the jury decide whether the prosecution had proven this crime beyond a reasonable doubt so that it could consider it in aggravation. The reliability of this evidence "was a jury question, and went to the weight of the evidence, not its admissibility." (*People v. Anderson* (2001) 25 Cal.4th 543, 587 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

### 2. *Admission of Hearsay Evidence to Prove Corpus Delicti*

The prosecution presented evidence that on December 20, 1978, defendant and three others kicked in an apartment door, robbed three men of their wallets, and hit one of the victims in the head with a gun. The victims were not available to testify. Instead, the prosecution presented the testimony of two police officers who responded to the scene and evidence of defendant's confession to the crime.

Armando Marrujo and D.C. Ogan, who were police officers in 1978, testified that they responded to the apartment in question on December 20, 1978. They observed that "the door frame at the point where the lock engages was shattered, had been forced open." Officer Marrujo observed that one of the occupants "was holding a cloth to his forehead and it was saturated with blood." He appeared to have received a recent injury that was still bleeding. Defendant admitted his involvement in the crime. He said that one of his cohorts kicked in the door. Then, when one of his cohorts said to pass the money, the persons inside "handed me their wallets. I got the money and . . . I ran outside." He said that when he was running, one of his group hit one of the victims with his gun. Later, the group met to divide the money. They had gotten $109 dollars, which was "split up three ways." Defendant received "thirty some odd dollars," as did the other two. Over objection, the court also permitted Officer Marrujo to testify that the victim who was bleeding told him that one of the suspects told him, "Give me the money." The court admitted the statement to satisfy the corpus delicti rule, finding that it qualified as an exception to the hearsay rule as a spontaneous statement.

Defendant argues the court erred in admitting the victim's hearsay statement that one of the suspects said, "[g]ive me the money," and that the error violated his Sixth Amendment right to confront witnesses. He also argues that without this statement, there was no evidence to establish the corpus delicti of the crime and, accordingly, his confession should not have been admitted. We

conclude that, even without this hearsay statement, the prosecution adequately proved the necessary corpus delicti, and defendant's confession was properly admitted. We also conclude that any error in admitting the hearsay statement was harmless beyond a reasonable doubt.

█ The corpus delicti "rule generally requires the prosecution to prove 'the body of the crime itself' independent of a defendant's extrajudicial statements." (*People v. Sapp* (2003) 31 Cal.4th 240, 303 [2 Cal.Rptr.3d 554, 73 P.3d 433].) We have never decided whether the rule applies to unadjudicated crimes admitted in aggravation at the penalty phase of a capital trial under the current death penalty law. (*Ibid.* [assuming without deciding that the rule does apply].) In *People v. McClellan* (1969) 71 Cal.2d 793, 805–806 [80 Cal.Rptr. 31, 457 P.2d 871], and *People v. Hamilton* (1963) 60 Cal.2d 105, 129–130 [32 Cal.Rptr. 4, 383 P.2d 412], concerning an earlier death penalty law, we held that the corpus delicti rule does apply to evidence of other crimes at the penalty phase. We relied on *McClellan* when we held that, under the current law, the prosecution must prove other crimes at the penalty phase beyond a reasonable doubt before the jury may consider them. (*People v. Robertson* (1982) 33 Cal.3d 21, 54 [188 Cal.Rptr. 77, 655 P.2d 279].) We have also cited *McClellan* and other older cases in concluding that "the rule requiring corroboration of accomplice testimony applies at the penalty phase of a capital trial." (*People v. Miranda* (1987) 44 Cal.3d 57, 100 [241 Cal.Rptr. 594, 744 P.2d 1127].) The corpus delicti "rule is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1169 [119 Cal.Rptr.2d 903, 46 P.3d 372].) Although a jury does not *convict* the defendant of other crimes at a penalty phase (*People v. Visciotti* (1992) 2 Cal.4th 1, 71 [5 Cal.Rptr.2d 495, 825 P.2d 388]), given "the overriding importance of 'other crimes' evidence to the jury's life-or-death determination" (*People v. Robertson, supra,* at p. 54), this general purpose applies here. Accordingly, we conclude that the corpus delicti rule does apply to unadjudicated crimes offered in aggravation at the penalty phase of a capital trial under current law.

But we must decide exactly what crime must be shown. The crime for which there must be a corpus delicti is the same as the crime that must be proven. Section 190.3, factor (b), permits the jury to consider in aggravation any "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (See *People v. Boyd* (1985) 38 Cal.3d 762, 776–777 [215 Cal.Rptr. 1, 700 P.2d 782].) This statute "refers to 'criminal activity,' not specific crimes." (*People v. Cooper, supra,* 53 Cal.3d at p. 840.) "No specific 'elements' are at issue except that *some* violent criminal offense must exist." (*People v. Melton* (1988) 44 Cal.3d 713, 754 [244 Cal.Rptr. 867, 750 P.2d 741].) Accordingly, at the penalty phase of a capital trial, as to each

unadjudicated crime, the prosecution need only establish, independently of the defendant's statements, the corpus delicti of a crime admissible in aggravation under section 190.3, factor (b)—that is, a crime involving the use or attempted use, or threat to use, force or violence. Once *that* corpus delicti is established, "the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*People v. Alvarez, supra,* 27 Cal.4th at p. 1171.)

■ In this case, the prosecution established the corpus delicti of a crime of violence—robbery or assault. The corpus delicti consists of (1) the fact of injury, loss or harm, and (2) the existence of a criminal agency as its cause. (*People v. Alvarez, supra,* 27 Cal.4th at p. 1168.) The identity of the defendant as the perpetrator is not part of the corpus delicti; identity may be established by the defendant's words alone. (*People v. Wright* (1990) 52 Cal.3d 367, 404 [276 Cal.Rptr. 731, 802 P.2d 221].) Moreover, "the modicum of necessary independent evidence of the corpus delicti, and thus the jury's duty to find such independent proof, is not great. The independent evidence may be circumstantial, and need only be 'a slight or prima facie showing' permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues." (*People v. Alvarez, supra,* at p. 1181.)

■ Here, the prosecution established, through the testimony of the responding officers, that the apartment door had been broken open, and one of the persons inside was bleeding from a recent head injury. This evidence permits an inference of a crime of violence. Doors do not normally get forced open without a criminal agency, and that circumstance combined with the head injury strongly suggests the crime involved violence. The evidence also permits an inference of robbery. A broken-open apartment door and a man inside with a bleeding head wound suggest robbery, a very common purpose for a home invasion. Indeed, few other possible explanations for these events come to mind, and none so likely as robbery. These might not be the only possible inferences, but they are certainly *reasonable* inferences, which is sufficient. (*People v. Jones* (1998) 17 Cal.4th 279, 301–302 [70 Cal.Rptr.2d 793, 949 P.2d 890].) Even disregarding the victim's hearsay statement, little chance exists that defendant confessed to a violent crime that never occurred.

■ Moreover, in *People v. Alvarez, supra,* 27 Cal.4th 1161, we considered the corpus delicti rule in light of the adoption, by passage of Proposition 8 in 1982, of article I, section 28, subdivision (d) of the California Constitution. We held that "insofar as the corpus delicti rule restricts the admissibility of incriminatory extrajudicial statements by the accused, [article I,] section 28[, subdivision] (d) abrogates it." (*People v. Alvarez, supra,* at p. 1174; see *People v. Sapp, supra,* 31 Cal.4th at p. 303.) Accordingly, the corpus delicti rule no longer prevents admission of the confession.

██ Defendant argues that the prior crime at issue occurred in 1978, and therefore Proposition 8, allowing defendant's out-of-court statements, does not apply. We disagree. In *People v. Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149], we held "that Proposition 8 applies only to prosecutions for crimes committed on or after its effective date." The only crime for which defendant was *prosecuted* in this trial was the 1993 murder of Roberto Cruz, which occurred long after Proposition 8's effective date. A capital defendant "is not on trial for the past offense, [and] is not subject to conviction or punishment for the past offense . . . ." (*People v. Visciotti, supra,* 2 Cal.4th at p. 71; see also *People v. Melton, supra,* 44 Cal.3d at pp. 754–755.) "Rather, the evidence of criminality . . . is simply one factor the penalty jury is to consider in deciding the appropriate punishment for the capital offense." (*People v. Balderas* (1985) 41 Cal.3d 144, 205 [222 Cal.Rptr. 184, 711 P.2d 480], fn. omitted.) Accordingly, because the crime for which defendant is being prosecuted occurred in 1993, Proposition 8 and our holding in *People v. Alvarez, supra,* 27 Cal.4th 1161, apply here. (See also *People v. Mickle* (1991) 54 Cal.3d 140, 171 & fn. 14 [284 Cal.Rptr. 511, 814 P.2d 290] [Prop. 8 applies to impeachment with a prior conviction if the charged crime postdated its enactment even if the prior conviction predated its enactment]; *People v. Jackson* (1985) 37 Cal.3d 826, 833 [210 Cal.Rptr. 623, 694 P.2d 736] [an enhancement for a serious felony conviction under Prop. 8 may be imposed if the charged crime postdated its enactment even if the prior crime predated its enactment].)[8]

Defendant's confession was therefore admissible both because the prosecution presented sufficient evidence to establish the corpus delicti of a crime of violence under section 190.3, factor (b), and under our holding in *People v. Alvarez, supra,* 27 Cal.4th 1161. *Alvarez* additionally held that, notwithstanding Proposition 8, the court must "instruct the jury that [the defendant's extrajudicial] statements cannot be the sole proof the crime occurred." (*People v. Alvarez, supra,* at p. 1181; see *People v. Sapp, supra,* 31 Cal.4th at p. 304.) The trial court so instructed the jury.

For these reasons, the trial court properly admitted defendant's confession and correctly instructed the jury regarding the corpus delicti rule. Admitting the hearsay statement of one of the victims, which added nothing to defendant's own confession, was harmless beyond a reasonable doubt. Accordingly, we need not decide whether admitting the statement was error.

---

[8] In *People v. Sapp, supra,* 31 Cal.4th at pages 303–304, we said that Proposition 8 applied because the unadjudicated prior crime had occurred after its adoption. Any implication in this statement that Proposition 8 would not apply if the prior crime had predated its adoption would be dicta because the issue was not presented. For the reasons stated, we conclude that Proposition 8 applies to this case.

### 3. *Admission of Evidence of a Photographic Lineup*

Defendant contends the court erred in admitting evidence regarding the unadjudicated robbery of October 21, 1982. The record indicates that the victim had had brain surgery between the time of the crime and his testimony in July 1995 that might have affected his ability to recall the events of 1982. He testified about the robbery but did not identify defendant as the robber at trial. He did not remember going to the police station to make a photographic identification. However, he identified his signature and his handwriting on the identification document. He also testified that in his dealings with the police regarding the crime and the identity of the robber, he tried to be truthful and as accurate as he could.

After the victim testified, defendant objected to admission of evidence of his extrajudicial identification of defendant as the robber. Defense counsel stated, and the prosecutor did not deny, that no copy of the photographic lineup still existed. After discussion and hearing the prosecutor's offer of proof regarding the police officer's proffered testimony, the court overruled the objection. Thereafter, Detective Curtis McMillan testified that on November 5, 1982, the victim came to the police station to view a photographic lineup. He testified that the victim wrote on the identification form, "I looked at six photographs and number 5 was closest to the man robbed me. His hair is short as he was—And his face look the same, but his nose was smaller." Detective McMillan signed the form indicating that he had witnessed the identification. Photograph No. 5 was a photograph of defendant.

As he did at trial, defendant challenges the admissibility of the extrajudicial identification on numerous grounds. We need not decide whether the court erred in admitting the evidence, for any error was harmless. The criminal incident at issue here was merely one of a long series of prior crimes the prosecution proved at the penalty phase, and not a particularly remarkable one at that. The prosecution proved that defendant had suffered 10 prior felony convictions for crimes committed on 10 separate occasions. It also presented evidence of the facts and circumstances of the crimes committed on eight of those occasions, as well as seven unadjudicated prior crimes of violence. This totals 17 prior separate criminal episodes, all but one of which involved force or violence (the exception being defendant's conviction of grand theft from the person). In his argument to the jury, the prosecutor mentioned the robbery at issue here only briefly, and even then he recognized that the identification "wasn't positive, that it looked like number five, and number five was [defendant]." We see no reasonable possibility (the functional equivalent of the reasonable doubt test; see *People v. Gonzalez* (2006) 38 Cal.4th 932, 961 [44 Cal.Rptr.3d 237, 135 P.3d 649]) the penalty determination turned on whether the jury found defendant had committed 17

previous crimes or only 16. (See *People v. Smith, supra,* 30 Cal.4th at p. 625; *People v. Barnett* (1998) 17 Cal.4th 1044, 1173 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

### 4. *Admission of Victim Impact Evidence*

Over defendant's objection, the trial court permitted the victim's parents to testify regarding their son and the impact his murder had on them.

Juana Cruz testified that she and her husband lived in the town of San Juan Dapida in the state of Oaxaca in Mexico. Roberto was 22 years old when he was killed. He went to the United States in 1989, when he was 18 years old, to help them financially because they were very poor. She described the poverty in which the family had lived in Mexico. Roberto graduated from high school, which made her very proud because she had never learned to read or write. He sent money and clothes to his parents "so we could sustain ourselves." She missed her son greatly.

Martin Cruz testified that his son Roberto was a "very good person" who loved his parents and siblings very much. He was a good son, and Martin loved him very much. Martin testified about the poverty in which they lived in Mexico. Roberto sent them money and clothes from the United States. He was the most intelligent and dependable of his children. The family relied on the money he would send. Martin thinks continually about Roberto and misses him badly. He identified a photograph of Roberto and read to the jury the last letter Roberto sent them.

■ Defendant contends the court erred in permitting this testimony. However, we have upheld victim impact evidence in many cases. "Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056–1057 [47 Cal.Rptr.3d 467, 140 P.3d 775].) "The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.'" (*Id.* at p. 1056, quoting *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].) The evidence here came well within permissible limits and, indeed, was very typical of the victim impact evidence we routinely permit. (See *People v. Lewis and Oliver, supra,* at p. 1057.) Contrary to defendant's argument, testimony regarding the circumstances in which the victim and his family lived in Mexico and the victim's actions in the United States to ameliorate his family's poverty was relevant to show the impact the murder had on his family. We see no error.

### 5. *Alleged Prosecutorial Misconduct*

 Defendant contends the prosecutor committed numerous acts of misconduct at the penalty phase. We disagree. The prosecutor represented his client vigorously, as the defense attorneys did theirs. Vigorous representation, however, is not misconduct.

Defendant first complains that, in his opening statement to the jury, the prosecutor stated over objection that, as to some of defendant's prior crimes, the victims originally did not appear at the preliminary hearing, which caused the case to be dismissed and, as a result, defendant "did not suffer any consequences from that." We see no impropriety.

Defendant next complains of the prosecutor's examination of two prosecution witnesses, the victims of the March 9, 1979, assault. The prosecutor asked the first witness if he had told the police whether or not he was willing to cooperate at trial. Defendant's objection was overruled, and the witness answered, "Yes." The prosecutor then asked, "Did you ever express any fear to the police officer?" The court sustained defendant's relevance objection, and the witness did not answer the question. The prosecutor asked the second witness on redirect examination whether he had expressed to the police concern for his safety. The witness said yes, and that because he used to see some of the individuals in his neighborhood, he was afraid. Defendant did not object to this questioning of the second witness. Instead, on recross-examination, defense counsel asked the witness whether he had made an identification only because he was afraid.

Later, defendant moved the court to strike these answers and order a mistrial, arguing that questions regarding fear were a "nonstatutory aggravating factor," and that the prosecution had not proven that defendant had done anything to cause the fear. The prosecutor responded that the witnesses' fear was relevant to the strength of their identification of defendant. He noted that "no one ever said he was threatened by anyone not to testify." The court denied the mistrial motion. Regarding defendant's concern that the jury might misconstrue the testimony as suggesting that defendant had threatened the witnesses, the court offered to consider giving a special instruction if defendant wanted one. Defendant never requested such an instruction.

 Defendant contends the questions regarding whether the witnesses felt fear improperly suggested defendant had threatened the witnesses or otherwise caused the fear. The contention is forfeited regarding the second witness because defendant did not object to the questioning. (*People v. Samayoa, supra*, 15 Cal.4th at p. 841.) Instead, he questioned the witness himself regarding how this fear may have affected his identification. In any

event, we see no misconduct. Although the court sustained defendant's objection to the question regarding fear asked of the first witness, it did not have to do so. Evidence of fear is relevant to the witness's credibility. (*People v. Burgener* (2003) 29 Cal.4th 833, 869 [129 Cal.Rptr.2d 747, 62 P.3d 1].) It was appropriate for the prosecutor to ask these questions, just as it was appropriate for defense counsel to ask whether the witness had made an identification only because he was afraid. The court said it would consider giving a special instruction if defendant were really concerned the jury might read into the evidence more than was warranted. Defendant did not request such an instruction. It does not appear any was needed because there was no evidence or suggestion that defendant had caused any such fear. Because there was no misconduct, the court properly denied the mistrial motion.

Defendant next complains of the prosecutor's cross-examination of a defense penalty phase witness. Eliseo Rosales testified regarding the contents in the victim's backpack the day he died. On cross-examination, the prosecutor established that the witness had spoken with an investigator from the public defender's office three times and had been shown a photograph. He then asked whether, having talked to the public defender's office three times, he was certain regarding his memory of the backpack's contents. The court overruled defendant's numerous objections that the questioning was argumentative. Later, defense counsel expressed concern that the prosecutor implied that the public defender's office had done something improper. The court offered to give an instruction that the jury's decision "is to be based on the evidence, not on any perceptions or impressions of misconduct by the investigator or the attorney assigned to represent the defendant."

Defendant contends that in this questioning, as well as in the previous acts he complains of, "[t]he prosecutor committed egregious misconduct by insinuating that defense counsel, [defendant] and defense witnesses fabricated a defense." It is "improper for the prosecutor to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case." (*People v. Thompson* (1988) 45 Cal.3d 86, 112 [246 Cal.Rptr. 245, 753 P.2d 37].) But the prosecutor here did not do so. He merely asked proper questions testing the reliability of the witness's credibility. Asking the witness whether his current testimony, which occurred nearly two years after the crime, was based on his actual memory or on his discussions with the public defender's office was a proper way to test the witness's credibility.

Defendant next complains of the prosecutor's cross-examination of his penalty phase mental health expert, Dr. George Woods. He first complains about how the prosecutor began the cross-examination. The prosecutor said, "We are going to start off on good terms, right?" to which the witness responded, "We're always on good terms." The prosecutor said, "You probably realize that you are in for a long afternoon," to which the witness

responded, "Yes." The prosecutor said, "You have been down this road before?" to which the witness responded, "Yes." Defendant complains this beginning "subtly but intentionally communicated to the jury that he had a history with this witness, and therefore had a basis for making him endure a 'long afternoon.' " The claim is not cognizable because defendant did not object. Moreover, this little bit of bantering seems like a harmless way to begin what both participants apparently anticipated would be a long cross-examination.

At one point, the prosecutor questioned Dr. Woods regarding the information defense counsel had provided him. He asked to "approach [the witness] with documents which have been marked for discovery." Defense counsel objected and a bench conference ensued. Defense counsel claimed the prosecutor had committed misconduct and moved for mistrial. They argued that many of the documents the prosecutor was holding were irrelevant to the case, and the prosecutor was improperly trying "to say the doctor didn't see all of that information and therefore the doctor's information is incomplete and therefore his opinion is invalid." They estimated that the stack of materials the prosecutor was holding was about 18 inches high. The prosecutor responded that he could "ask an expert witness about things he did not consider. It goes to the weight the jury gives to his opinion. . . . If the defense has chosen to give him certain items and not give him others, the jury is entitled to know that the weight of his testimony should be given little credibility." The court overruled the objection.[9] In front of the jury, the prosecutor questioned the witness extensively regarding what information he did and did not consider in forming his opinion. Later, defendant renewed his motion for a mistrial "based on the district attorney's showmanship, the theatricalship of putting that big stack of papers of front of Dr. Woods." The court denied the motion and found no misconduct. To the extent the defense was concerned that the prosecutor's actions, in addition to testing the credibility of the witness, tended to suggest the defense had acted improperly in withholding information, the court offered to admonish the jury not to consider such matters.

Defendant argues, as he did at trial, that the prosecutor committed misconduct in showing the stack of materials to the jury. We see no misconduct and certainly no prejudice. The prosecutor was fully entitled to question the witness regarding what materials he did and did not consider in forming his opinion. To the extent defendant claims some, or even most, of the materials the prosecutor showed the witness were irrelevant, he was entitled to bring this out on redirect examination. The important point was that the witness had

---

[9] One of the attorneys also complained the prosecutor was talking so loudly that the jury could hear. The court appeared to disagree. To the extent defendant claims misconduct on this basis, the record does not support the claim.

considered some materials and not other materials. This was relevant to the jury's judging what weight to give the opinion. The court offered to admonish the jury not to consider any claims of defense misconduct that these actions may have implied. Defendant describes this and similar offers to give an admonition should the defense so wish as "meaningless." The offers were not meaningless. Although defense counsel did not accept the court's offers to admonish the jury, we have no reason to doubt that the court would have given the admonitions had defendant so requested. We also believe that any such admonitions would have been sufficient to forestall any prejudice.

Defendant claims that the prosecutor's cross-examination of Dr. Woods was "unduly argumentative." We have read the record and disagree. The cross-examination was vigorous, as it was entitled to be, but it did not cross the line into misconduct. Defendant notes, correctly, that defense counsel made many objections at trial; indeed, on appeal he states, rather colorfully but somewhat accurately, that his "trial counsel were up and down like jack-in-the-boxes, making objections to the substance, tone and form of the prosecutor's questions." But the existence of many objections by one party does not establish misconduct by the other. The court was in control. It generally sustained defense objections when appropriate and otherwise properly allowed the prosecutor to conduct his cross-examination within permissible limits. On one occasion, after the witness prefaced one of his answers by saying, "[t]o be honest with you," the prosecutor asked whether that meant he had not been honest regarding other questions. To the extent this specific question might have been unduly argumentative, it was harmless.

Defendant also claims the prosecutor committed misconduct during his penalty argument to the jury. We have reviewed the entire argument, as we must. "Although defendant singles out words and phrases, or at most a few sentences, to demonstrate misconduct, we must view the statements in the context of the arguments as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) As a whole, the prosecutor engaged in a reasoned and fair discussion of the law and facts and made a proper argument why the jury should return a death verdict. He went out of his way to tell the jury that defense counsel had done a good job, had "acted ethically," and had "done nothing wrong whatsoever." He told the jury his view that only factors (a), (b), and (c) of section 190.3 (respectively, circumstances of the crime, criminal activity involving force or violence, and prior felony convictions) could be considered in aggravation. He discussed these aggravating circumstances in detail, then discussed the applicability of the factors in mitigation. Naturally, he generally argued that the various statutory mitigating factors either did not apply or were not significant compared to the aggravating factors. As he explained to the jury, he had to try to anticipate later defense arguments because he would have no opportunity to rebut the defense argument. He then argued against what he anticipated

would be the defense arguments in mitigation. In discussing the mitigating factors, he carefully explained to the jury that the "absence of a mitigating factor does not equal aggravation." He also impressed on the jury the importance of its decision by stating, "you must assume that whatever decision you make will be carried out." To the extent the prosecutor occasionally misspoke, it was a minor mistake that was generally corrected on objection. As a whole, the argument came well within the range of permissible argument.

██ Defendant first claims the prosecutor continued to cast aspersions on defense counsel and witnesses. The prosecutor certainly cast aspersions on some of the defense witnesses. He argued that some were not credible, and permissibly so. "Harsh and vivid attacks on the credibility of opposing witnesses are permitted, and counsel can argue from the evidence that a witness's testimony is unsound, unbelievable, or even a patent lie." (*People v. Dennis, supra*, 17 Cal.4th at p. 522.) Contrary to defendant's argument, the prosecutor did not denigrate defense counsel; rather, he vigorously denigrated the defense case, as was his right as an advocate. In a contention akin to a comparable guilt phase argument, defendant argues that on one occasion, the prosecutor used paraleipsis. (See pt. II.A.1., *ante.*) Defendant did not object, so the issue is not cognizable. The comment was also insignificant.

██ Defendant also claims the prosecutor misstated the law and the evidence. The prosecutor argued in aggravation that defendant had killed for money, which was appropriate given the evidence. He also suggested defendant had committed a carjacking, a suggestion he agreed was mistaken when the court expressed concern about it. Given the prosecutor's withdrawal of the suggestion, we see no misconduct. Regarding the law, defendant claims the prosecutor improperly argued the absence of certain mitigating factors. We disagree. As noted, the prosecutor never suggested the absence of a mitigating factor was itself aggravating. But he was certainly entitled to point out the absence of mitigation. Moreover, although the prosecution may not argue that the jury is not *permitted* to consider mitigating evidence, it may argue that certain evidence does not in fact mitigate or at least attempt to minimize the mitigating effect of the evidence. (*People v. Cleveland* (2004) 32 Cal.4th 704, 764 [11 Cal.Rptr.3d 236, 86 P.3d 302].) The prosecutor here did no more.

Defendant also claims the prosecutor improperly referred to matters not in evidence. At one point, in arguing against the defense that defendant acted in a belief that he was defending himself, the prosecutor noted that defendant had stabbed Cruz many times, which would not have been necessary had he merely believed he was defending himself. The prosecutor continued, "And that is an aggravating factor because he kept stabbing him until he was dead.

Had he not made that choice, Mr. Cruz possibly could have survived that attack. He could have possibly received medical aid and maybe survived." Defendant claims there was no evidence regarding the victim's chances for survival. The claim is not cognizable because defendant did not object at trial. In any event, it requires no specific evidence to argue that if defendant had merely defended himself rather than continued to stab the victim and had sought prompt medical help, the victim might have survived. At another point, the prosecutor stated his view of what life in prison meant. The court sustained defendant's objection. To the extent this comment was improper, it could not have been prejudicial, especially in light of the fact the court sustained the objection.

Defendant also claims the prosecutor improperly appealed to the jurors' passions or prejudices and committed error under *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], which prohibits the prosecutor from arguing to the jury that the responsibility for determining the appropriateness of the death penalty lies elsewhere. (See *People v. Cleveland, supra,* 32 Cal.4th at p. 762.) We have reviewed the comments defendant cites and find no impropriety. The argument was not unduly emotional. Moreover, rather than suggesting the responsibility for determining the appropriateness of the death lay elsewhere, the prosecutor emphasized the seriousness of the decision, noting that it would take "courage" to reach a "just verdict." Indeed, he specifically stated that the jury was to assume its "decision will be carried out. Whether it be life without parole or the death penalty."

### 6. Limiting Defense Counsel's Jury Argument

Before the parties presented their penalty arguments to the jury, the court held hearings regarding the boundaries of possible argument. One topic was the extent to which either party could comment on defendant's demeanor during the trial. The prosecutor expressed the belief it would be improper for him to comment on defendant's demeanor because defendant had not testified. Defense counsel, however, stated that they wanted to discuss defendant's apparent reaction to the testimony of some of the defense witnesses. The court asked the parties to provide authorities to help it make a ruling, and continued the matter.

At the next hearing, the court stated that it interpreted the cases cited to it as allowing comment on a defendant's demeanor only if he testified or put his character into evidence. The court believed defendant had not placed his character into evidence and, indeed, had "studiously avoided" doing so. Defense counsel agreed that they had not placed defendant's general character into evidence, but they argued that they had narrowly presented evidence of defendant's "emotional feelings for his family and their feelings for him."

They stated they were "not seeking to argue demeanor other than what appeared obviously in the courtroom." For example, they wanted to comment that when defendant's niece and nephew testified, the jury could see "that there was genuine love on behalf of our client toward those children . . . ." Additionally, they wanted to comment that when a witness named Charles Burwell testified that he and defendant were like brothers, defendant "actually broke down significantly and cried," thus showing his love for Burwell.

The court ruled that defense counsel could argue about the feelings the witnesses had for defendant "and that there must be some redeeming aspect of the defendant that would trigger those expressions by those witnesses." But it disallowed comment on defendant's demeanor. It expressed concern about permitting comment on a nontestifying defendant's demeanor: "You mention the defendant's demeanor in a positive frame, but this has been a long trial. What I'm afraid will happen is one of the jurors may have seen some different aspect of his demeanor. And if I let either one of you start talking about demeanor when the defendant has not testified and character is not an issue, then they go back and deliberate about that, I just think that we're asking for some major difficulties."

Defendant argues the court erred in not permitting his attorneys to comment on his demeanor in reacting to the testimony of some of the defense witnesses. We agree. As the trial court noted, a number of cases have stated that the prosecutor may comment on the defendant's demeanor when the defendant has testified or placed his character into evidence. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1023 [108 Cal.Rptr.2d 291, 25 P.3d 519] ["It is proper for a prosecutor, at the penalty phase at which the defendant has placed his or her character in issue as a mitigating factor, to make references to the defendant's facial demeanor apparent during the court proceedings."]; *People v. Wharton* (1991) 53 Cal.3d 522, 596 [280 Cal.Rptr. 631, 809 P.2d 290]; *People v. Jackson* (1989) 49 Cal.3d 1170, 1205–1206 [264 Cal.Rptr. 852, 783 P.2d 211]; *People v. Heishman* (1988) 45 Cal.3d 147, 197 [246 Cal.Rptr. 673, 753 P.2d 629].) But we have not limited comment on demeanor to those situations. In *People v. Navarette* (2003) 30 Cal.4th 458, 516 [133 Cal.Rptr.2d 89, 66 P.3d 1182], we simply stated that "a prosecutor may comment during closing argument on a defendant's demeanor." (See also *People v. Beardslee* (1991) 53 Cal.3d 68, 114 [279 Cal.Rptr. 276, 806 P.2d 1311] [the prosecutor was entitled "to comment on defendant's facial demeanor as he sat in the courtroom"]; *People v. Haskett* (1990) 52 Cal.3d 210, 247 [276 Cal.Rptr. 80, 801 P.2d 323] ["Reference to courtroom demeanor is not improper during the penalty phase."].) Indeed, in *People v. Duncan* (1991) 53 Cal.3d 955, 977 [281 Cal.Rptr. 273, 810 P.2d 131], we said that the "prosecutor was entitled to point out that modest behavior in the courtroom was not inconsistent with violent conduct under other less structured and controlled circumstances."

In *People v. Williams* (1988) 44 Cal.3d 883 [245 Cal.Rptr. 336, 751 P.2d 395], as one reason for denying the automatic motion to modify the death judgment, the trial court stated that the defendant " 'was emotionally calm during the entire trial.' " (*Id.* at p. 970, fn. 50.) We found the comment proper for reasons that apply here: "A defendant's demeanor may reflect remorse, or otherwise arouse sympathy in either jury or judge. Because the jury, and the judge in deciding whether to modify a verdict of death, must be permitted to consider any evidence that is relevant and potentially mitigating [citation], this is relevant to appropriate consideration." (*Id.* at pp. 971–972.)

Just as *negative* comment on a defendant's demeanor is permissible, so too is favorable comment. Moreover, the trial court interpreted character evidence too narrowly. Although defendant avoided broad character evidence, he did present evidence of the love between him and some of the witnesses. The court erred in prohibiting defense counsel from arguing that defendant's demeanor during the testimony reflected the love he felt.

But the error was harmless. As evidenced by the fact that all cases on point involve defendants challenging the propriety of *prosecutorial* comments on demeanor, comment on demeanor can be very risky for the defense. The court prohibited *both* parties from commenting on demeanor. Although legally incorrect in its ruling, it was reasonably concerned that, on balance, comment on demeanor could harm defendant. Moreover, the court did not preclude the jury from *considering* anything it believed relevant, including defendant's courtroom demeanor. The jury could observe defendant and draw its own conclusions. The court merely limited defense counsel's jury argument in a very narrow fashion.

The defense penalty phase argument to the jury was thorough, broad based, and wide-ranging. Among many other things, the defense attorney who made the penalty argument urged that the jury should consider in mitigation the evidence from defendant's family and friends about their feelings for defendant and their love for him. She argued that defendant cares about those who love him and discussed how he protected his mother even as a young child. She discussed defendant's brother's testimony that defendant cared about his relatives. She discussed his sister's testimony that defendant sometimes cried when confronted with some of his family's problems. She argued that to others, defendant's "life has value," and that even persons not related to him love him. She noted that one witness testified that defendant "show[ed] he cared about" her and her children, and that another witness testified about a time when defendant was "moved to tears" after the witness's wife had suffered a stroke. Discussing another witness, she argued that defendant "loved her, she loved him."

The attorney discussed the testimony of defendant's niece and nephew. Although she was not permitted to comment on defendant's visible reaction to that testimony, she did argue, while apparently referring to a photograph of him with the children that defendant had placed into evidence, that defendant's face and smile unmistakably indicated "his love for those children." She discussed in detail Charles Burwell's testimony. She noted that Burwell "says that Fred [defendant] calls every other week," that he always talked about others, not about himself, and that he was supportive of other people's problems. She stressed Burwell's testimony that if defendant were executed, it would affect his children and his wife, "and it will have a very major impact on me. . . . And he [Burwell] says, this man [apparently referring to defendant] started to fill that void. And if I lose him, I am losing my brother all over again, and I don't want that to happen."

In light of all of these circumstances, we see no reasonable possibility the verdict would have been different if, additionally, defense counsel had commented on defendant's visible reaction to the testimony of his niece, nephew, and Burwell. (*People v. Gonzalez, supra,* 38 Cal.4th at pp. 960–961.) Stated equivalently (*id.* at p. 961), the error is harmless beyond a reasonable doubt.

### 7. *Jury Instructions and Challenges to California's Death Penalty Law*

■ Defendant contends the court erred in refusing to give special instructions he requested that would have told the jury that the guilt and special circumstance verdicts are not themselves aggravating, and that they must reconsider the guilt phase evidence during their penalty deliberations. However, the standard jury instructions the court gave "are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards." (*People v. Barnett, supra,* 17 Cal.4th at pp. 1176–1177.) No additional instructions were required. Similarly, defendant contends the court erred in refusing to modify CALJIC No. 8.85 in various respects. We have rejected similar arguments. CALJIC No. 8.85 is both correct and adequate. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1266–1268 [74 Cal.Rptr.2d 212, 954 P.2d 475]; see also *People v. Moon* (2005) 37 Cal.4th 1, 40–41 [32 Cal.Rptr.3d 894, 117 P.3d 591]; *People v. Carter* (2003) 30 Cal.4th 1166, 1229–1231 [135 Cal.Rptr.2d 553, 70 P.3d 981].) The court need not give pinpoint instructions regarding what mitigating evidence the jury may consider, or special instructions regarding mercy and compassion. (*People v. Panah* (2005) 35 Cal.4th 395,

497 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Noguera* (1992) 4 Cal.4th 599, 647–648 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) Contrary to defendant's argument, CALJIC No. 8.88 properly instructs the jury on its sentencing discretion and the nature of its deliberative process. (*People v. Smith* (2005) 35 Cal.4th 334, 369–371 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

Defendant contends the court had a sua sponte duty to instruct on how the jury could consider the victim impact evidence. Specifically, he argues the court had to instruct the jury that the evidence "had been introduced for the specific and limited purpose of showing the specific harm caused by the [defendant's] actions or the nature of the unique loss felt by each witness, and that the victim, like the defendant, was a unique individual; that it would be improper for the jurors to assess the comparable worth of [defendant] and Mr. Cruz and his survivors; that their deliberations on the victim impact evidence must be limited to an unemotional, rational inquiry into [defendant's] moral culpability; and that it would be improper for [defendant's] sentence to be solely based upon the victim impact evidence." We disagree. Because the standard instructions adequately inform the jury of its duty, the court was not required to instruct on how the jury may consider victim impact evidence. (*People v. Ochoa* (2001) 26 Cal.4th 398, 455 [110 Cal.Rptr.2d 324, 28 P.3d 78].) Defendant points out that in *People v. Harris, supra,* 37 Cal.4th at pages 358–359, we rejected the defendant's argument that the trial court erred in giving a prosecution-requested instruction on victim impact evidence. But we never suggested the court was obligated to give any such instruction. Moreover, the instruction we upheld in that case was quite different from the one defendant argues the court should have given here.[10] We see no need to elaborate on the standard instructions regarding how the jury should consider any particular type of penalty phase evidence.

Defendant reiterates a number of challenges to California's death penalty law that we have repeatedly rejected. The sentencing factor of "circumstances of the crime" (§ 190.3, factor (a)) is not unconstitutionally vague and does not result in the arbitrary and capricious imposition of the death penalty. (*People v. Lewis* (2001) 26 Cal.4th 334, 394 [110 Cal.Rptr.2d 272, 28 P.3d 34].) The death penalty law is not invalid for failure to provide for intercase proportionality review. (*Pulley v. Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871]; *People v. Mincey* (1992) 2 Cal.4th 408, 476 [6 Cal.Rptr.2d 822, 827 P.2d 388].) (We do provide *intracase* proportionality review. Defendant does not specifically request such review, but given the crime and

---

[10] In *Harris,* the trial court instructed that " '[i]f supported by the evidence, it is proper to consider the impact of the murder on the victim's family (including their pain and suffering) when determining the appropriate penalty. You are further instructed that such evidence is to be included within the meaning of factor (a), the circumstances of the offenses, in the preceding instruction (CALJIC No. 8.85) and is not a separate factor in aggravation.' " (*People v. Harris, supra,* 37 Cal.4th at p. 358.)

his long criminal record leading up to it, it is inconceivable that it would aid him. (*People v. Steele* (2002) 27 Cal.4th 1230, 1269 [120 Cal.Rptr.2d 432, 47 P.3d 225].) "The jury need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes), that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate penalty. [Citations.] The death penalty statute is not unconstitutional for failing to provide the jury with instructions of the burden of proof and the standard of proof for finding aggravating and mitigating circumstances in reaching a penalty determination." (*People v. Morrison* (2004) 34 Cal.4th 698, 730–731 [21 Cal.Rptr.3d 682, 101 P.3d 568].) The jury's consideration of unadjudicated criminal activity in aggravation (§ 190.3, factor (b)) is constitutional, and jury unanimity regarding such conduct is not required. (*People v. Brown* (2004) 33 Cal.4th 382, 402 [15 Cal.Rptr.3d 624, 93 P.3d 244]; *People v. Anderson, supra,* 25 Cal.4th at pp. 584–585.) Recent United States Supreme Court decisions do not undermine these conclusions. (*People v. Stevens* (2007) 41 Cal.4th 182, 212 [59 Cal.Rptr.3d 196, 158 P.3d 763]; *People v. Morrison, supra,* at p. 731.) The court need not instruct that the jury can consider certain statutory factors only in mitigation. (*People v. Brown, supra,* at p. 402.) Use of the adjectives "extreme" and "substantial" in the sentencing factors (§ 190.3, factors (d), (g)) is constitutional. (*People v. Avila* (2006) 38 Cal.4th 491, 614–615 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) The death penalty law does not violate equal protection principles. (*People v. Moon, supra,* 37 Cal.4th at p. 48; *People v. Smith, supra,* 35 Cal.4th at p. 374.)

### 8. *International Law*

Contrary to defendant's contention, a sentence of death that complies with state and federal constitutional and statutory requirements does not violate international law. (*People v. Tafoya* (2007) 42 Cal.4th 147, 199 [64 Cal.Rptr.3d 163, 164 P.3d 590].)

### 9. *Cumulative Effect of Alleged Errors*

Defendant contends that the cumulative effect of the alleged errors was prejudicial. We disagree. The errors we have found or assumed were insignificant in light of the trial as a whole. Considered either separately or in combination, we find no reasonable possibility they affected the verdicts.

### III. CONCLUSION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied June 25, 2008. George, C. J., and Corrigan, J., did not participate therein.