Filed 7/1/15  P. v. Pacheco CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B255360 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA380962) |
| v. | |
| MARTIN PACHECO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Lisa B. Lench, Judge.  Affirmed.

Thien Huong Tran, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Martin Pacheco (Pacheco) was convicted of attempted premeditated murder (Pen. Code, §§ 664/187; count 1)[1] and possession of a firearm by a felon (§ 12021, subd. (a)(1); count 3).[2] On appeal, he claims that the trial court erroneously allowed the jury to consider preliminary hearing testimony of a witness who did not appear at trial. We find no error and affirm.

## FACTS

<u>Background</u>

On October 15, 2010, Edward Martinez (Martinez), Gilbert Adame (Gilbert), and Michael Adame (Michael) were relaxing in the front yard of Gilbert's apartment complex with a few others. At the time, Martinez was a member of the Clover gang, and he had a verbal altercation with "Gunner," a member of a rival gang known as Lincoln Heights. Later, Gunner returned and punched Martinez in the face. Gunner said, inter alia, that Martinez was "going to get it" and then walked away.

Martinez and others moved to benches in back of the complex. Soon after, a man appeared and began shooting, ultimately hitting Martinez in the head, left hand and left leg.

<u>Motion to Admit Michael's Preliminary Hearing Testimony</u>

Prior to trial, the prosecutor made a motion to admit the preliminary hearing testimony of Michael on the grounds that he was unavailable. The trial court held a hearing to determine whether the prosecution had been diligent in its efforts to secure Michael's presence at trial. During the hearing, the trial court heard the following evidence:

In June 2013, Los Angeles Police Officer Cynthia Peraza was asked by the prosecution to help locate witnesses. At the time, Michael was living in an apartment on Griffin Avenue. She went to Michael's apartment on June 20, 2013, and July 16, 2013,

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     In count 2, Pacheco was charged with attempted premeditated murder. Count 1 and count 2 pertain to different victims.

to serve him with a subpoena, but she was unable to because he was not home on any of those occasions.

In early July 2013, Thomas Snook (Snook), an investigator with the Los Angeles County District Attorney's Office, was assigned to locate Michael and other witnesses and serve subpoenas on them to appear in court. To prepare, Snook did a workup on Michael. During that process, Snook ran a background check on Michael, obtained his photograph and found two potential addresses, one on Griffin Avenue and another on a street named Locke.

On September 4, 2013, and September 5, 2013, Snook called the phone number he was given for the Griffin Avenue address and left a voicemail. He called the number again on September 6, 2013, and did not get an answer. That same day, Snook tried to serve Michael. At the Griffin Avenue address, Snook was greeted by a woman who identified herself as Michael's mother, Lupe Adame (Lupe), and said that Michael lived at that address but was not home. Though Snook was able to leave a business card with Lupe, she refused to accept Michael's subpoena.

On September 10, 2013, Snook returned to the Griffin Avenue address and spoke with a man named Tommy who claimed to be Michael's nephew. Tommy reported that Michael lived at the house but was not presently home. Snook left a business card and asked to have Michael call him. On September 11, 2013, Snook went to the Griffin Avenue address residence and spoke to a man named John who also claimed to be Michael's nephew. John said that Michael did not live at the home anymore, and that he did not know where Michael had gone. On September 12, 2013, Snook knocked on the door at the Griffin Avenue address. There was no answer.

Officer Peraza returned to the Griffin Avenue address on September 11, 2013, and September 12, 2013, looking for Michael. On September 11, 2013, Officer Peraza spoke to a person named Tony at the Griffin Avenue address and told him it was possible that bench warrants would be issued for anyone who refused to appear in court for the trial. Tony indicated that the witness was scared. At one point, Officer Peraza spoke to Lupe, who said she did not know Michael's whereabouts. Officer Peraza knew Michael was a

3

Marine. When she saw some clothes and a military hat near the front door, she asked Lupe if those were his clothes. Lupe said yes. Officer Peraza asked if Michael still lived at the Griffin Avenue address, and Lupe said, "Yes, off and on he's here. And sometimes he goes with his girlfriend." Lupe refused to give Officer Peraza the girlfriend's address.

At some point, Gilbert spoke to Michael about a block away from the Griffin Avenue address and told him that he should appear in court to avoid being arrested. Michael got mad. He shrugged, said he "didn't give a fuck," and walked away. After that conversation, Gilbert saw Michael again when he came by the Griffin Avenue house to pack up his clothes. Michael did not leave any contact information with Gilbert or say where he was going.

On September 24, 2013, Los Angeles police officer Aaron Skiver went to the Griffin Avenue address, located Gilbert and arrested him on a bench warrant. According to Gilbert, Michael had been living at the Griffin Avenue address for four or five years prior to Gilbert's arrest. When Officer Skiver asked Lupe about Michael, she said he did not live with her anymore but that he did stop in to check on her from time to time. Officer Skiver left a subpoena for Michael, at which point Lupe said she did not have an address or phone number for him. The next day, Officer Skiver returned to the Griffin Avenue address to check for Michael again. Lupe again told Officer Skiver that she had not seen Michael and did not know where he was.

On October 1, 2013, Snook spoke to Lupe at the Griffin Avenue address. She said Michael did not live there anymore, and said she thought he was living with a girlfriend in Thousand Oaks. She did not provide Snook with an address for the girlfriend. Snook called Michael's son that same day and asked him to call Michael and have him contact Snook by phone. Michael's son indicated that he would try, but his calls to Michael went unanswered and unreturned.

On October 8, 2013, Snook left a voice message for Michael but did not get a response. Also, Snook contacted Michael's ex-wife, Mary Adame. She said she had spoken to Michael within the previous three weeks and she thought he was still living at

4

the Griffin Avenue address. If he had moved out, she thought he would be living with his son in Thousand Oaks.

Snook researched possible addresses for Michael's son in Thousand Oaks and found one on Flittner Circle where his in-laws lived. When Snook went to that location, there was no answer at the door. A neighbor recognized a photograph of the son but said he did not live on Flittner Circle. The neighbor did not recognize a photograph of Michael. Next, Snook went to an address on Briarwood Place. When he got no answer at the door, and he left a business card. Finally, he went to an address on McAfee Court. The manager at that location said that Michael's son had been evicted after he failed to pay rent.

Ruth Gonsalves (Gonsalves) called Snook. She said she was Michael's ex-wife, that she believed he was living at the Griffin Avenue address, and she had seen him there three days earlier. The next day, Snook returned to the Griffin Avenue residence and spoke to Gilbert, who said that Michael did not live there anymore. The next day, on October 9, 2013, Snook returned again to the Griffin Avenue address and contacted Gilbert, who said that Michael did not live there. The following day, on October 10, 2013, Snook and another investigator tried to serve a subpoena on Michael at the Griffin Avenue address. He was not there.

Shortly before the due diligence hearing on October 17, 2013, Snook went to the Locke street address. Snook encountered residents at the address and showed them a photograph of Michael. They did not recognize it. They said they had been living at that address for several years.

After the parties argued, the trial court ruled that the prosecution had been diligent in attempting to locate Michael to secure his presence as a witness at trial, and that Michael was therefore deemed unavailable for purposes of Evidence Code section 240, subdivision (a)(5).[3]

---

[3]     Evidence Code section 240, subdivision (a)(5) provides that "'unavailable as a witness'" means that a declarant is "[a]bsent from the hearing and the proponent of his or

5

Identification Evidence at Trial

While on the way to the hospital, Martinez told an accompanying police officer that Gunner and another individual had gotten out of a car, one of them shot him, and the Lincoln Heights gang was behind the shooting. Five days later, Martinez told an officer that according to Gilbert, the shooter was a gang member with the moniker "Action." A week after the shooting, Gilbert initialed a written statement identifying the shooter as Action. An officer conducting an investigation determined that Gunner was Samuel Chester from Lincoln Heights, and Action was Pacheco from Lincoln Heights.

At the preliminary hearing, Gilbert identified Pacheco, also known as Action, as the person who shot Martinez. During trial, Gilbert initially denied his preliminary hearing testimony. However, later in the trial, he identified Pacheco as the shooter.

The prosecutor read portions of Michael's testimony from the preliminary hearing. In that testimony, he stated that when he heard shots from inside his apartment, he ran out and chased the suspect. While at the preliminary hearing, Michael identified Pacheco as the man he had chased. They knew each other, and Pacheco called Michael by his nickname, "Wiz," which was short for "Wizard," and told him to stop. Pacheco then ran away.

The People's gang expert testified that he was personally familiar with Pacheco, and stated that Pacheco was a member of the Lincoln Heights gang who went by the moniker "Action."

Conviction; Sentencing

The jury convicted Pacheco on counts 1 and 3, and acquitted him on count 2. It found the following allegations true: Pacheco personally and intentionally discharged a firearm and caused bodily damage within the meaning of section 12022.53, subdivision (d); he personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c); and the offenses were committed for the benefit of, at the

---

her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

6

direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members within the meaning of section 186.22, subdivisions (b)(1)(C) and (b)(5).

On count 1, Pacheco was sentenced to 40 years to life. On count 3, he was sentenced to the mid-term of two years. The sentence on count 3 was stayed pursuant to section 654.

This timely appeal followed.

## DISCUSSION

Pacheco's sole assignment of error is that the trial court allowed Michael's testimony at the preliminary hearing to be admitted at trial. According to Pacheco, that admission was in violation of his right to confront witnesses under both the federal and state Constitutions. The state and federal rights of confrontation, which are coextensive, are not absolute. (*People v. Valencia* (2008) 43 Cal.4th 268, 291–292 (*Valencia*).) "If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial." (*Id*. at p. 291; Evid. Code, § 1291, subd. (a)(2).) It is the trial court's finding of unavailability with regard to Michael that Pacheco disputes on appeal. A finding of unavailability for constitutional purposes requires the prosecution to show that it used "'due diligence'" in trying to locate the witness. (*People v. Fuiava* (2012) 53 Cal.4th 622, 675 (*Fuiava*); Evid. Code, § 240, subd. (a)(5).) The trial court determined that the prosecution had made such a showing. We review this determination de novo. (*People v. Cromer* (2001) 24 Cal.4th 889, 901 (*Cromer*).)

Due diligence "'"connotes . . . efforts of a substantial character." [Citation.]'" (*Fuiava*, *supra*, 53 Cal.4th at 675.) Relevant considerations include whether the search was initiated in a timely fashion, the importance of the witness's testimony, and whether leads were competently explored. (*Ibid*.)

Michael's testimony was important, as it was one of only two identifications of Pacheco as the perpetrator. However, the search here was begun well ahead of time, more than four months before the testimony was required. Further, all leads were more

than competently explored: the police investigators ran a background check on Michael, personally visited every address they could obtain for him, and they were in repeated contact with his relatives and associates. Starting efforts four months before the testimony was required, and running down every bit of contact information obtained, shows efforts of substantial character. We therefore agree with the trial court that the prosecution made a showing of due diligence.

Pacheco argues that the prosecution's failure to conduct surveillance of Michael's primary known address constituted a failure of due diligence. We disagree. The obligation to search for a witness with due diligence does not mean that the prosecution must exhaust every avenue. According to case law, a finding of due diligence is not prevented by the fact "'"that additional efforts might have been made or other lines of inquiry pursued . . . ."'" (*Valencia*, *supra*, 43 Cal.4th at p. 293.) All that must be shown is that the prosecution "'"used reasonable efforts to locate the witness." [Citation.]'" (*Ibid*.) Here, we conclude that the police and the prosecution's investigators used reasonable efforts to locate Michael.[4]

Next, Pacheco argues that the prosecution failed to show due diligence because it neglected to search out Michael's girlfriend despite learning that he was living with her. This argument is without merit. Lupe refused to give Officer Peraza and Snook the address of the alleged girlfriend. As a matter of inference, Lupe either did not know the girlfriend's name or refused to provide one. It was also possible that the alleged girlfriend did not exist. Thus, the police and the prosecution were not provided with sufficient information to locate the alleged girlfriend. It would be unreasonable to expect the officers to track down Michael's girlfriend when they had nothing to go on. This is particularly true given that the police and prosecution had consistent evidence that Michael was living at the Griffin Avenue address, as shown by the following: Officer

---

[4]     Our Supreme Court has refused to impose a requirement on the police to "keep 'periodic tabs'" on material witnesses in criminal cases. In reaching this conclusion, it recognized that the administrative burdens of such a requirement would be prohibitive. (*People v. Hovey* (1988) 44 Cal.3d 543, 564.)

8

Peraza saw some of Michael's clothes at the Griffin Avenue address; at one point Lupe said Michael lived there off and on; Mary and Ruth both thought Michael was living at the Griffin Avenue address and had seen him there; Michael's nephew, Tommy, said that Michael still lived there; a person named Tony at the Griffin Avenue address indicated that Michael was scared to appear in court, implying recent contact; Gilbert spoke to Michael a block away from the Griffin Avenue address; and Gilbert said Michael was living there prior to Gilbert's arrest on September 24, 2013.

Finally, Pacheco suggests that *Cromer* dictates a finding in his favor. But in that case, the prosecution had reason to know that the witness had moved from her original residence a full six months before trial. Nonetheless, investigators made no effort to serve subpoenas on the witness until the month before the trial. When they attempted to serve the witness, they went to her former address six or seven times only to be told that she no longer lived there. (*Cromer*, *supra*, 24 Cal.4th at p. 903.) After the trial was continued, investigators procured the witness's new address with her mother in another city. Despite the urgency of the situation, the investigators did not follow up for two days. They eventually went to the new address, only to be told that the witness's mother was out and the witness did not live there. (*Id*. at pp. 903–904.) There was no further attempt at contacting the witness or her mother beyond searches of data records. (*Id*. at p. 904.) In this case, the prosecution began action months before trial. Moreover, it investigated five possible addresses, made numerous visits and phone calls, and talked to multiple people about Michael. The effort in this case was far more thorough and persevering than the effort disapproved in *Cromer*.

All other issues are moot.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                ASHMANN-GERST


We concur:


_____, P. J.
        BOREN


_____, J.
        HOFFSTADT