Filed 10/16/24  P. v. Salas CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JESUS SALAS,<br><br>Defendant and Appellant. | B324105<br><br>(Los Angeles County<br>Super. Ct. No.  KA063662) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott Taryle, Supervising Deputy

Attorney General, and Gabriel Bradley, Deputy Attorney
General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Jesus Salas Jr. of willful, deliberate, and
premeditated murder and attempted willful, deliberate, and
premeditated murder and found true various firearm allegations.
The trial court sentenced Salas to a prison term of 50 years to
life, plus a term of life with a minimum parole eligibility of seven
years. The trial court struck the firearm enhancements on the
attempted murder conviction.

Salas argues the trial court erred in instructing the jury
with CALCRIM No. 571 and CALCRIM No. 604 on imperfect self-
defense for murder and attempted murder, respectively. Salas
contends the instructions were erroneous because they did not
tell the jurors that they could convict him of voluntary
manslaughter rather than murder (and attempted voluntary
manslaughter rather than attempted murder) if they found he
used more force than was reasonably necessary for self-defense.

We conclude that the trial court did not err in instructing
the jury on self-defense with the pattern jury instructions.
Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *Salas Kills One Person and Injures Another*

August 29, 2003 was Osiris "Ozzy" Bernal's 19th birthday.
That evening his friends Juan "Johnny" Mora and Moises Villalta
were celebrating with Bernal at his home in El Monte with a few

2

other friends. They were hanging out, drinking, and listening to the radio.

After the group had been at Bernal's house for three or four hours, a car drove by around midnight with Salas in the back seat. The car drove away toward Salas's house, and the group continued hanging out in Bernal's garage.

Five minutes later, Salas appeared in the street in front of Bernal's house. Mora walked over to Salas and asked why he was there. As Mora approached Salas, he noticed Salas had a rifle. Mora told him to leave. Villalta saw Salas was screaming and acting aggressive toward Mora. Villalta pushed Mora out of the way and swung at Salas. Salas took a step back and fired several shots, hitting Villalta in the chest. Villalta swung at Salas two more times.

Mora grabbed Villalta, lowered him to the ground, and tried to hide behind a car. As Mora ran away, Salas shot him in the shoulder. Mora looked and saw Salas running backward and shooting in Mora's direction. Bernal called the 911 emergency operator, and paramedics arrived and took Villalta and Mora to the hospital. Villalta died as a result of his gunshot wound.

B.     *Salas Describes His History with the Assassins and Salas Gives His Version of the Shooting*

According to Salas, long before the August 29, 2003 shooting he had conflicts with a group of men that included Bernal, Villalta, and Mora and whose members referred to themselves as the Assassins. The members of the group said they dressed "like rebels and greasers . . . in the 50's and 60's" and went to parties together so that other people would "think twice about approaching you the wrong way." Although the

3

members admitted they called themselves the Assassins, they denied they killed people.

The conflict between Salas and the Assassins went back to 2000, when Salas was attacked by Danny Leyva, the older brother of one of the Assassins. Salas was in bed when he heard a loud noise outside his house. He went outside and saw a car colliding with the front gate to his driveway. Salas looked outside and saw a car driven by Leyva pulling out of his driveway. Salas got in his car and chased Leyva's car. When Salas caught up with Leyva's car, Leyva pulled Salas out of his car, and Leyva and other members of the Assassins beat him up in the street. One of the Assassins got into Salas's car and drove away in it. As a result of his injuries, Salas had to use crutches for six months.

A year later, on April 14, 2001, Salas called the 911 emergency operator to report a drive-by shooting at his home. Salas claimed that Mora was driving the car involved in the shooting and that Villalta, a passenger in the car, fired four or five shots at Salas while Salas was standing in his front yard. Although Salas claimed at trial Mora and Villalta were responsible for the shooting, at the time of the shooting Salas told the police that members of a local gang, El Monte Flores, had fired the shots at his home. Salas claimed at trial he did not want to tell the police who was actually responsible because he feared retaliation.

On February 15, 2002 Salas again heard gunshots outside his house. Salas claimed that, when he looked out his window, he saw Villalta shooting at the windows of Salas's car with a shotgun, as Mora watched. Salas claimed that, prior to these incidents, Mora had tried several times to get him to join the

4

Assassins and had asked Salas to help him obtain a master key to steal cars. Salas declined to join the Assassins or obtain a master key to assist in stealing cars.

Fearing for his life after another attack by Leyva, Salas met with a detective to discuss the incidents with the Assassins. The detective told Salas that he should move out of his home and move to Mexico. Salas, who was on probation at the time, did not follow the detective's advice.

Testifying about his version of the August 29, 2023 shooting, Salas stated that he was outside his home when he saw Villalta and other members of the Assassins approach his house. Salas claimed Villalta told him he "was a snitch" and they should "handle it in the streets or [they] were going to handle it then and there." Fearing for his safety, Salas grabbed his gun and ran. Bernal, Mora, and Villalta tried to attack Salas, and Villalta hit him. Salas pulled out his gun to make the men back away, and Bernal grabbed the barrel of Salas's gun. As Salas and Bernal struggled over the gun, the gun fired several shots, one of them into the air. Salas ran away, firing additional shots behind him without looking where he was pointing his gun.

Following this incident, Salas went to Mexico on a previously planned trip. Salas, who did not know he had shot anyone, learned the next day Villalta had died. Salas decided to stay in Mexico because he was scared he would be killed in retaliation if returned home. Salas remained in Mexico for 17 years before authorities finally arrested him and extradited him to the United States. Salas told police he had been acting in self-defense against the Assassins.

C.    *The Trial Court Instructs the Jury on Self-defense*

At a pre-trial hearing in December 2021, counsel for Salas stated he planned to argue accident and self-defense. The trial court pointed out that accident and self-defense were inconsistent theories because self-defense required an intentional, not accidental, use of deadly force and that proceeding on both theories could confuse the jury.

After reviewing the jury instructions with counsel, the trial court, despite concerns about Salas's conflicting theories, agreed to Salas's request to instruct the jury on accident and self-defense. The trial court stated it would instruct the jury on imperfect self-defense for murder with CALCRIM No. 571 and on imperfect self-defense for attempted murder with CALCRIM No. 604. Neither counsel for Salas nor the prosecutor objected to these instructions.

The trial court instructed the jury on self-defense with CALCRIM No. 505: "The defendant is not guilty of murder and attempted murder if he was justified in killing or attempting to kill someone in self-defense. The defendant acts with lawful self-defense if: 1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury; 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [and] 3. The defendant used no more force than was reasonably necessary to defend against the danger."

The trial court also instructed the jury on imperfect self-defense for murder with CALCRIM No. 571: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted with what's called imperfect self-defense. If you conclude the defendant acted

6

in complete self-defense, his action was lawful, and you must find him not guilty of any crime.  The difference between complete self-defense and imperfect self-defense depends on whether the defendant's beliefs in the need to use deadly force was reasonable.  The defendant acted in imperfect self-defense if: 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [but] 3. At least one of those beliefs was unreasonable.

Finally, the court instructed the jury on imperfect self-defense on attempted murder with CALCRIM No. 604:  "An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill a person because he acted in imperfect self-defense.  If you conclude that the defendant acted in complete self-defense, his action was lawful.  You must find him not guilty of any crime.  The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.  The defendant acts with imperfect self-defense if:  1. The defendant took at least one direct but ineffective step toward killing a person; 2. The defendant intended to kill when he acted; 3. The defendant believed that he was in imminent danger of being killed or suffering great bodily injury; 4. The defendant believed that the immediate use of deadly force was necessary to defend against

7

the danger; and 5. At least one of the defendant's belief's was unreasonable."

### D. *The Jury Convicts Salas, and the Trial Court Sentences Him*

The jury found Salas guilty of the willful, deliberate, and premeditated murder of Villalta and the attempted willful, deliberate, and premeditated murder of Mora.  The jury also found true firearm allegations under section 12022.53, subdivisions (b), (c), and (d).

The trial court sentenced Salas on his murder conviction to 50 years to life (25 years to life for first degree murder, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d)) and on his attempted murder conviction life with a minimum parole eligibility of seven years. The court struck the firearm enhancements with respect to the attempted murder.   Salas timely appealed.

## DISCUSSION

As discussed, the defendant acts in lawful or perfect self-defense (which means the defendant is not guilty of murder) if he or she (1) reasonably believes he or she was in imminent danger of being killed or suffering great bodily injury, (2) reasonably believed using deadly force was necessary to defend against the danger, and (3) uses no more force than reasonably necessary to defend against the danger.  As also discussed, the defendant acts in imperfect self-defense (which reduces murder to voluntary manslaughter) if he or she (1) actually but unreasonably believes he or she was in imminent danger of being killed or suffering

8

great bodily injury or (2) actually but unreasonably believes using deadly force was necessary to defend against the danger. But, as Salas points out, the defendant does not act in imperfect self-defense if he or she reasonably believes that the danger is imminent and that the use of deadly force is necessary, but uses more force than necessary (thus making perfect self-defense unavailable). Salas argues CALCRIM No. 571, the pattern instruction on imperfect self-defense that reduces murder to voluntary manslaughter, and CALCRIM No. 604, the pattern instruction on imperfect self-defense that reduces attempted murder to attempted voluntary manslaughter, "are erroneous to the extent they do not allow a jury to find the defendant guilty of voluntary manslaughter or attempted voluntary manslaughter based on the use of more force than was reasonably necessary to defend against the danger."

The court in *People v. Morales* (2021) 69 Cal.App.5th 978 (*Morales*) rightly rejected this very argument. In that case the jury convicted the defendant of second degree murder for stabbing the victim to death. (*Id.* at p. 983.) The defendant argued CALCRIM No. 571 "was insufficient because it failed to tell the jury that a homicide also qualifies as voluntary manslaughter and not murder when a defendant's beliefs in danger and the need to use deadly force are reasonable but the sort of deadly force he uses is excessive and more than necessary to repel the attack. He argues that if the jury found he reasonably believed he would suffer great bodily injury from [the victim] in the course of the robbery and reasonably believed he needed to arm himself against [the victim], but found that stabbing [the victim] in the abdomen was more force than was

reasonably necessary, the jury could find him guilty of voluntary manslaughter."  (*Id.* at p. 995.)

In rejecting that argument, the court in *Morales* stated that the Supreme Court in *People v. Valencia* (2008) 43 Cal.4th 268 at page 288 "made clear that 'not every unreasonable belief will support a claim of imperfect self-defense'; rather, a defendant can claim imperfect self-defense based only on a belief 'that, if reasonable, would support a claim of perfect self-defense.' [Citation.]  For example, if a defendant unreasonably believes someone is going to punch him in the arm and stabs him to death in response, 'this belief would not support a claim of imperfect self-defense for the reason that the belief, even if reasonable, would not permit the use of deadly force.'"  [Citation.]  In such a scenario, the use of force would be excessive but still would not reduce a homicide to voluntary manslaughter.  Similarly here, if [the defendant] reasonably believed he needed to use force against [the victim] but used more force than was necessary, then he could not claim perfect self-defense.  As a result, he cannot claim imperfect self-defense, either.  (*Morales*, *supra*, 69 Cal.App.5th at p. 995.)

The court in *Morales* also stated that the defendant had not explained "how his stabbing could be based on his reasonable belief in the need to use of *deadly* force but still qualify as *excessive*.  If [the defendant] reasonably believed he needed to use deadly force to prevent [the victim] from harming him, his use of a single stab with his knife would appear to be reasonable. [Citation.]   [The defendant] also cites no authority for his position that one type of deadly force could be reasonable but another could be excessive.  The relevant consideration is whether a defendant uses more force than is necessary to repel

10

an attack, not the type of deadly force used by a defendant." (*Morales*, *supra*, 69 Cal.App.5th at p. 996, fn. omitted.)

Similarly, if Salas reasonably believed he needed to use deadly force to defendant against the danger posed by Villalta, but used more force than reasonable, he could not claim perfect self-defense. And, as Salas concedes, because he cannot claim perfect self-defense, he cannot claim imperfect self-defense. (See *People v. Enraca* (2012) 53 Cal.4th 735, 761 ["claim of imperfect self-defense would be unavailable because a claim of perfect self-defense would have been unavailable had the belief been reasonable"]; *People v. Valencia*, *supra*, 43 Cal.4th at p. 288 [same].)

Salas argues "*Morales* goes off the rails of sound analysis" because the Supreme Court case on which it relies, *People v. Valencia*, *supra*, 43 Cal.4th 268, "is not an excessive force case." Salas argues that *Morales* "conflates the aspect of self-defense related to the belief in the need to use deadly force with the aspect related to using an excessive amount of such force" and that "[e]xcessive deadly force can come into play only if it is reasonable to use deadly force in the first place." But it is Salas's concept of "excessive deadly force" that is not consistent with the doctrine of self-defense. Once deadly force is justified, the defendant may use whatever force it takes to kill. As with the defendant in *Morales*, Salas cites no authority for his assertion that the jury instructions on perfect and imperfect self-defense should distinguish between different degrees of deadly force. (See *Morales*, *supra*, 69 Cal.App.5th at p. 996.) Had the jury believed Salas's testimony, his response to the danger presented by Villalta (and perhaps Mora) would have been reasonable, no matter how many shots he fired. The trial court's instructions

11

accurately conveyed the law on imperfect self-defense for murder and attempted murder.

## DISPOSITION

The judgment is affirmed.

SEGAL, J.

We concur:

MARTINEZ, P. J.          STONE, J.